UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KELLY PINN,<br><br>    Plaintiff,<br><br>v.<br><br>CONSUMER CREDIT COUNSELING FOUNDATION, INC., et al.,<br><br>    Defendants. | Case No. 22-cv-04048-DMR<br><br>**ORDER ON MOTION TO COMPEL ARBITRATION AND MOTION TO DISMISS THIRD-PARTY COMPLAINT**<br><br>Re: Dkt. No. 65 |

In this putative class action, Plaintiff Kelly Pinn challenges Defendants' alleged practice of making unsolicited telemarketing phone calls to individuals who have registered their phone numbers on the national Do Not Call registry. Defendants are Consumer Credit Counseling Foundation, Inc. ("CCCF"); National Budget Planners of South Florida, Inc. ("NBP"); Ishwinder Judge, an individual; and Digital Media Solutions, LLC ("DMS"). CCCF filed a third-party complaint against DMS. [Docket No. 43.] DMS now moves to compel arbitration as to CCCF, or in the alternative, to dismiss the third-party complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). This matter is suitable for determination without oral argument. Civ. L.R. 7-1(b). For the following reasons, the motion to compel arbitration is granted.

**I.  BACKGROUND**

    **A.  Allegations in the Second Amended Complaint**

Pinn makes the following allegations in the operative second amended complaint ("SAC"). [Docket No. 82 (SAC).] Pinn is a United States resident. Her residential telephone is registered on the national Do Not Call registry. *Id*. at ¶ 3. She alleges that CCCF and NBP are Florida corporations that do business in California and that Judge is CCCF's Chief Executive Officer, Secretary, and Chief Financial Officer. *Id*. at ¶¶ 4-6. CCCF "purports to offer credit counseling

services and debt management plans." *Id*. at ¶ 22.  Pinn alleges that CCCF, NBP, and Judge "use telemarketers to solicit business from potential consumers across the country . . . to purchase their products and services through aggressive, outbound telemarketing campaigns" and use "illegal telemarketing campaigns to promote" their debt counseling services.  *Id*. at ¶ 30.[1]

        DMS is a Delaware corporation with an office in Florida.  *Id*. at ¶ 8.  Pinn alleges that "[o]n August 2, 2021, CCCF contracted with DMS to obtain live transfers of qualified 'leads,' potential customers of CCCF[.]"  On January 22, 2022, DMS contracted with Vedanata Infotech ("Vedanata"), a telemarketing company in India, "to make outgoing calls and to supply such leads to CCCF."  *Id*. at ¶¶ 32, Exs. 1 at 0047-48, 2 at 0045-46.

        Pinn alleges that she received multiple unsolicited and unauthorized telemarketing calls from a spoofed telephone number in April 2022.  Pinn answered the last of these calls.  When she answered, the caller stated that he was calling from "Credit Associates" and asked Pinn about her financial situation.  The caller eventually connected Pinn to "his advisor."  *Id*. at ¶¶ 40-42.  The advisor told Pinn that she was from CCCF, offered to consolidate Pinn's debts through CCCF's program, and provided Pinn with an email address and telephone number linked to CCCF.  *Id*. at ¶ 42.  CCCF later sent Pinn an email promoting "a 'Debt Management Plan Summary' under which consumer loans would be consolidated under a 5.95% interest rate . . ."  *Id*. at ¶ 43.

        On April 13, 2022, Pinn emailed a complaint to CCCF.  She alleges that CCCF forwarded her complaint to DMS and requested evidence of Pinn's consent to the calls.  "Although DMS had records of Vedanata's calls to Pinn and confirmed the calls were made via a live agent campaign, it did not provide evidence of Pinn's consent to those calls," denied that it made the calls, and asserted that the calls were made by Vedanata.  *Id*. at ¶ 46.  The CCCF Defendants demanded DMS defend and indemnify them in this action.  *Id*.

        Pinn alleges that she never provided her telephone number to Defendants or their agents for any purpose whatsoever, and that Defendants and their agents "did not obtain Pinn's prior

---

[1] The SAC includes allegations about a Doe Defendant that Pinn alleges is a "for-profit business affiliated with CCCF."  *See* SAC ¶ 26.  However, the deadline to seek leave to amend the pleadings to add new parties was April 18, 2023, and Pinn failed to name the Doe Defendant by that deadline.

express consent to make telemarketing calls to her telephone number." She further alleges that she did not have an established relationship with Defendants, Defendants did not call to collect an existing obligation, and Pinn never asked Defendants to call her. *Id*. at ¶ 44. She brings one claim against Defendants on behalf of herself and a class of individuals: violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(c)(5).

### B. Allegations in CCCF's Third-Party Complaint

CCCF filed a third-party complaint against DMS. It alleges that "DMS is a provider of lead generation services." On August 2, 2021, CCCF and DMS entered into a Client Master Services Agreement ("2021 MSA") and an "Insertion Order" "that provided for DMS to provide 'Debt Live Transfers' services to DMS." 3d Party Compl. ¶¶ 7, 8. CCCF and DMS entered into a second Client Master Services Agreement ("2022 MSA") on July 28, 2022, which provided that it would "specifically supersede any terms executed prior to or after the effective date of this Agreement[.]" *Id*. at ¶ 9.

The 2022 MSA stated that DMS would comply with the TCPA and state and federal consumer protection laws in "collect[ing] leads for transfer to [CCCF][.]" It also provided that "DMS shall indemnify and hold [CCCF] . . . harmless from and against all direct liabilities, losses, costs, expenses, (including reasonable attorney's fees), and damages relating to or arising from or in connection with: . . . (v) any and all violation of law (including the TCPA), rule, regulation, or other such binding legal authority by DMS . . ." *Id*. at ¶¶ 10, 11.

CCCF alleges that "in April 2022, DMS and/or DMS's agent made telephone calls to Plaintiff Kelly Pinn" and that "CCCF did not have any control over the telephone calls, and the telephone calls were not made on its behalf." It further alleges that Pinn sent a claim to CCCF on April 13, 2022 "alleging that she had received telephone calls in violation of the TCPA on April 11 and 12, 2022." CCCF gave DMS notice of this action on July 15, 2022 and requested that DMS defend and indemnify CCCF in this action, but DMS has not done so. *Id*. at ¶¶ 12-14.

CCCF brings two claims against DMS: 1) contractual indemnity pursuant to the second MSA; and 2) equitable indemnity.

3

### C. The Arbitration Agreement

As alleged, DMS and CCCF executed an Insertion Order on August 2, 2021. 3d Party Compl. ¶ 8. The Insertion Order contains a provision that "Client [CCCF] agrees to and accepts to be bound by all of the terms and conditions set forth in the Client Master Services Agreement ('MSA') entered into between the parties listed above on 8/2/21 . . . which is hereby incorporated by reference." [Docket No. 67 (Giardina Decl. June 1, 2023) ¶ 9, Ex. 2 (Insertion Order/2021 MSA) at 0047.] The 2021 MSA contains an arbitration provision:

> This Agreement shall be exclusively governed by the laws of the State of Florida without giving effect to conflict of law principles. The parties hereby consent to jurisdiction in the State of Florida and agree that at the discretion of DMS, **the American Arbitration Association shall have exclusive jurisdiction over any disputes or issues regarding the interpretation or enforcement of this Agreement and shall be resolved exclusively by arbitration under the then current Commercial Arbitration rules of the American Arbitration Association.** Venue for arbitration shall be exclusively from the nearest administrative office of the America Arbitration Association to Clearwater, Florida. Each party, without limitation, agrees that such venue is convenient, consents to such venue, and waives any defense to such venue. Venue for litigation shall be exclusively in the nearest court of appropriate jurisdiction to Clearwater, Florida . . .

2021 MSA § 24 (0065) (emphasis added).

DMS now moves to compel arbitration, arguing that DMS and CCCF agreed to a valid, binding arbitration agreement that covers the claims in the Third-Party Complaint. In the alternative, it moves pursuant to Rule 12(b)(6) to dismiss CCCF's claims.

## II. MOTION TO COMPEL ARBITRATION

### A. Legal Standard

The Federal Arbitration Act ("FAA") governs written arbitration agreements affecting interstate commerce. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 111-12 (2001). Enacted for the purpose of enforcing written arbitration agreements according to their own terms, the FAA embodies "the basic precept that arbitration 'is a matter of consent, not coercion.'" *Stolt– Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681 (2010) (quoting *Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)). Section 4 of the FAA ensures that "'private agreements to arbitrate are enforced according to their terms,'"

4

1  *Stolt–Nielsen*, 559 U.S. at 682 (quoting *Volt*, 489 U.S. at 479), by expressly authorizing a party to
2  an arbitration agreement to petition a United States district court for an order directing that
3  "arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4.

4        The FAA provides that an arbitration agreement "shall be valid, irrevocable, and
5  enforceable, save upon such grounds as exist at law or in equity for the revocation of any
6  contract." 9 U.S.C. § 2. "The final clause of § 2, generally referred to as the savings clause,
7  permits agreements to arbitrate to be invalidated by generally applicable contract defenses, such as
8  fraud, duress, or unconscionability, but not by defenses that apply only to arbitration or that derive
9  their meaning from the fact that an agreement to arbitrate is at issue." *Poublon v. C.H. Robinson*
10 *Co.*, 846 F.3d 1251, 1259 (9th Cir. 2017) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S.
11 333, 339 (2011) (internal quotation marks omitted)). "By its terms, the [FAA] leaves no place for
12 the exercise of discretion by a district court, but instead mandates that district courts *shall* direct
13 the parties to proceed to arbitration on issues as to which an arbitration agreement has been
14 signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original)
15 (citing 9 U.S.C. §§ 3, 4).

16       "In deciding whether to compel arbitration under the FAA, a court's inquiry is limited to
17 two 'gateway' issues: '(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether
18 the agreement encompasses the dispute at issue.'" *Lim v. TForce Logistics, LLC*, 8 F.4th 992, 999
19 (9th Cir. 2021) (quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th
20 Cir. 2000)). "If both conditions are met, 'the [FAA] requires the court to enforce the arbitration
21 agreement in accordance with its terms.'" *Id.* (quoting *Chiron*, 207 F.3d at 1130). Parties may
22 delegate gateway issues of arbitrability to the arbitrator if they "clearly and unmistakably" agree to
23 do so. *Portland Gen. Elec. Co. v. Liberty Mut. Ins. Co.*, 862 F.3d 981, 985 (9th Cir. 2017).

24     **B.**    **Discussion**

25       DMS argues that the FAA applies here and that the arbitration provision in the 2021 MSA
26 is valid, enforceable, and covers CCCF's claims in the Third-Party Complaint. According to
27 DMS, the 2021 MSA governed the parties' relationship during the conduct at issue in the Third-
28 Party Complaint and thus the arbitration provision applies.

CCCF disputes that the 2021 MSA applies and contends that the 2022 MSA governs its claims in this action. The 2022 MSA states only that "[t]his Agreement shall be exclusively governed by the laws of the State of California . . ." and is otherwise silent regarding dispute resolution. It does not contain an arbitration provision. *See* Giardina Decl. ¶ 10, Ex. 3 (2022 MSA) § 23. According to CCCF, the 2022 MSA "expressly superseded the 2021 MSA" and governs its claims in the Third-Party Complaint. Opp'n 2-3. Therefore, it argues, "the 2021 MSA effectively no longer exists" and the motion to compel arbitration must be denied.

As noted, the court's role is limited to determining "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Lim*, 8 F.4th at 999. "In deciding these questions, federal courts must 'place arbitration agreement[s] on equal footing with other contracts.'" *Samson v. NAMA Holdings, LLC*, 637 F.3d 915, 924 (9th Cir.2011) (quoting *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 293 (2002)). "Thus, [t]o evaluate the validity of an arbitration agreement, federal courts should apply ordinary state-law principles that govern the formation of contracts." *Id.* (alteration in original) (citations and internal quotation marks omitted).

DMS and CCCF executed the 2021 MSA on August 2, 2021. *See* 2021 MSA at 0066 (signatures dated Aug. 2, 2021). The agreement states, "[t]his MSA shall commence on the Effective Date and shall remain in effect for a period of one (1) year ('Initial Term'). Upon expiration of the Initial Term, this MSA shall automatically renew for successive one (1) year terms . . . unless either [CCCF] or DMS provides written notice of its intent to terminate . . ." *Id.* at § 5 (0053). The agreement defines the "Effective Date" as "the signature latest in time on the MSA," *id.* at 0048, which was August 2, 2021. *Id.* at 0066. Accordingly, the Initial Term under the 2021 MSA began on August 2, 2021 and ended on August 1, 2022 unless it automatically renewed.

The parties executed the 2022 MSA on July 28, 2022. 2022 MSA at 21. Like the 2021 MSA, the 2022 MSA had an "initial term" of one year starting on the "Effective Date," with an automatic renewal for successive one-year terms. 2022 MSA § 5 ("This MSA shall commence on the Effective Date and shall remain in effect for a period of one (1) year ('Initial Term').") The

6

2022 MSA defines the "Effective Date" as "the signature latest in time on the MSA," which was July 28, 2022. *Id*. at 1. The Initial Term under the 2022 MSA thus began on July 28, 2022 and ended on July 27, 2023 unless it automatically renewed.

DMS argues that "[t]he net effect" of the two separate MSAs with different terms "is that the 2022 MSA governs conduct after July 28, 2022, and the 2021 MSA governs conduct before." Reply 2. CCCF does not discuss the "effective dates" of the two MSAs. It also does not dispute that the conduct at issue underlying its claims against DMS—the phone calls to Pinn, Pinn's complaint, and CCCF's demand that DMS defend and indemnify it in this action—took place *before* July 28, 2022, during the time period covered by the 2021 MSA. *See* 3d Party Compl. ¶¶ 12-14 (alleging calls to Pinn and Pinn's complaint to CCCF took place in April 2022, and that CCCF requested defense and indemnification on July 15, 2022). Instead, CCCF argues that the 2022 MSA "constitutes 'a new agreement between the same parties on the same subject matter,' and supersedes the prior 2021 MSA." Opp'n 5 (citation omitted).

CCCF's argument rests on two provisions in the 2022 MSA. The first provides that "[t]his Agreement, including any exhibits or [Insertion Order(s)] attached or relating hereto, constitutes the entire agreement between the parties with respect to the subject matter hereof and expressly supersedes and governs against all other prior agreements, terms, negotiations, and understandings, both written and oral." 2022 MSA at 19, § 20. However, this integration clause is limited to "the subject matter hereof"—that is, the terms and conditions of the parties' relationship during the period beginning on July 28, 2022. The integration clause does not mention arbitration and the 2022 MSA contains no provision regarding dispute resolution other than the statement that California law governs the agreement. Courts have held that similar subsequent agreements between parties do not "cancel" prior agreements to arbitrate, where the subsequent agreements contain integration clauses that are limited "to the subject matter hereof," do not mention arbitration, and do not contain provisions regarding dispute resolution. *See, e.g., Jenks v. DLA Piper Rudnick Gray Cary US LLP*, 243 Cal. App. 4th 1, 15-16 (2015); *Oxford Preparatory Acad. v. Edlighten Learning Sols.*, 34 Cal. App. 5th 605, 612 (2019). In such circumstances, "the identified forum for dispute resolution remains arbitration based on the

original [agreement]." *Jenks*, 243 Cal. App. 4th at 16. The key case that CCCF cites on this point, *Grey v. American Management Services*, 204 Cal. App. 4th 803, 807 (2012), is distinguishable because the 2022 MSA contains language that limits the scope of the integration clause to "the subject matter of" the 2022 MSA, which does not have an arbitration clause. By contrast, the subsequent agreement in *Grey* included an arbitration clause. *Id*. at 805.

Moreover, nothing in the 2022 MSA indicates that the integration clause reflects the parties' intent that the 2022 MSA retroactively altered the rights and obligations of the parties during a time period covered by a different agreement. *See Oxford*, 34 Cal. App. 5th at 611 (holding that later agreement terminating the parties' rights and obligations with integration clause contained "no language . . . that can be interpreted to mean that the 'subject matter' of the agreement was to waive, extinguish, excuse, or release any right or obligation of either party arising prior to June 17, 2016" and did not "expressly or impliedly reflect the parties' desire to forgo arbitration of claims accruing before termination").

CCCF also relies on a provision in the 2022 MSA that states that "[t]his MSA will specifically supersede any terms executed prior to or after the effective date of this Agreement to the extent that such terms conflict." 2022 MSA 3, § 2(a); *see* Opp'n 6. But the full language of the provision refers to potential conflicts between the 2022 MSA and insertion orders ("IOs"), not to conflicts between the 2021 MSA and the 2022 MSA:

> DMS agrees to perform for Client the Services specified in any IO signed by authorized representatives of both parties that expressly references and incorporates this MSA. This MSA will specifically supersede any terms executed prior to or after the effective date of this Agreement to the extent that such terms conflict. In the event of conflict between this MSA and any related IO, the MSA shall control unless the IO expressly provides in writing that its terms shall supersede those of this MSA. . . .

2022 MSA 3, § 2(a).[2] CCCF does not cite to any language or provision of the 2022 MSA that

---

[2] The 2022 MSA defines "insertion order" as "those certain separate or attached written document(s) titled, substantially, Insertion Order, entered into and executed by both parties hereto and which incorporates this MSA by reference. IOs shall set forth the specific Services (defined below) to be provided, and may set forth additional terms such as the deliverables, scope, duration, responsibilities, fees, payment terms, and other details applicable to such Services (defined below)." 2022 MSA at 1, § 1(a).

8

suggests that the parties intended the 2022 MSA to alter obligations that arose under the 2021 MSA.

Finally, CCCF argues that the 2022 MSA was a "novation" of the 2021 MSA. Opp'n 7. "Novation is the substitution of a new obligation for an existing one." *Wells Fargo Bank v. Bank of Am.*, 32 Cal. App. 4th 424, 431 (1995) (quoting Cal. Civ. Code § 1530). "The substitution is by agreement and with the intent to extinguish the prior obligation." *Id.* "The effect of a novation is to make the original agreement a nullity (that is, void and of no effect), and the rights of the new parties are governed solely by the new agreement." *Eckart v. Brown*, 34 Cal. App. 2d 182, 187, (1939). CCCF argues that the "presence of an integration clause in the 2022 MSA is persuasive evidence that the 2022 MSA extinguished the 2021 MSA." Opp'n 7. It offers no authority to support this proposition, and as discussed above, nothing in the integration clause or the 2022 MSA indicates that the parties intended to retroactively alter the rights and obligations of the parties under the 2021 MSA or otherwise sought to nullify the 2021 MSA.

In sum, the court concludes that "a valid agreement to arbitrate exists." Accordingly, the sole remaining issue is whether the arbitration agreement encompasses the dispute at issue. The Third-Party Complaint expressly alleges that DMS and/or its agent "made telephone calls to Plaintiff Kelly Pinn" in April 2022; that Pinn sent a claim to CCCF regarding the calls on April 13, 2022; and that CCCF gave DMS notice of this action and requested defense and indemnification on July 15, 2022. *See* 3d Party Compl. ¶¶ 12-14. This conduct took place before July 28, 2022, when the 2022 MSA came into effect. As the 2021 MSA was in effect during the conduct at issue in this lawsuit, the arbitration agreement encompasses the parties' dispute.

Where a dispute is subject to arbitration under the terms of a written agreement, the district court shall "stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement," 9 U.S.C. § 3, although courts have discretion under Section 3 to dismiss claims that are subject to an arbitration agreement. *Sparling v. Hoffman Const. Co., Inc.*, 864 F.2d 635, 638 (9th Cir. 1988). Nonetheless, the Ninth Circuit has expressed its "preference for staying an action pending arbitration rather than dismissing it." *MediVas, LLC v. Marubeni Corp.*, 741 F.3d 4, 9 (9th Cir. 2014). The court finds it appropriate to stay the Third-Party Complaint pending

9

the outcome of CCCF and DMS's arbitration proceedings. The parties are directed to file a joint status report within two weeks of the completion of any arbitration.

### III.  MOTION TO DISMISS

As the court grants DMS's motion to compel arbitration, it need not reach DMS's Rule 12(b)(6) motion at this time. That portion of the motion is accordingly denied as moot.

### IV.  CONCLUSION

For the foregoing reasons, DMS's motion to compel arbitration as to CCCF's Third-Party Complaint is granted.

**IT IS SO ORDERED.**

Dated: October 20, 2023



Donna M. Ryu
Chief Magistrate Judge

10