Ethan Preston (263295)
ep@eplaw.us
PRESTON LAW OFFICES
4054 McKinney Avenue, Suite 310
Dallas, Texas 75204
Telephone: (972) 564-8340
Facsimile: (866) 509-1197

*Attorneys for Plaintiff Kelly Pinn, on her own behalf,*
*and on behalf of all others similarly situated*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KELLY PINN, an individual, on her own behalf and on behalf of all others similarly situated,<br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br>CONSUMER CREDIT COUNSELING FOUNDATION, INC., NATIONAL BUDGET PLANNERS OF SOUTH FLORIDA, INC., Florida corporations, and ISHWINDER JUDGE, an individual, and DOES 1-10, inclusive,<br><br>　　　　　　Defendants. | **REDACTED EXCERPT OF VIDEOCONFERENCE DEPOSITION OF PORUS ENGINEER**<br><br>No. 4:22-cv-04048-DMR |

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3    _____

 4    KELLY PINN, an Individual, on

 5    her Own Behalf and on Behalf of

 6    Others Similarly Situated,

 7          Plaintiff,

 8       v.                              Claim No.

 9    CONSUMER CREDIT CONSULTING          4:22cv-04048-DMR

10    FOUNDATION INC., NATIONAL BUDGET

11    PLANNERS OF SOUTH FLORIDA, INC.,

12    Florida Corporations, and

13    ISHWINDER JUDGE, an Individual,

14    and DOES 1-10, Inclusive,

15          Defendants.

16    _____

17        VIDEOCONFERENCE DEPOSITION OF PORUS ENGINEER

18    DATE:          Friday, July 12, 2024

19    TIME:          10:17 a.m.

20    LOCATION:      Remote Proceeding

21                   350 Sonic Avenue

22                   Livermore, CA 94551

23    OFFICIATED BY: Fernando Padilla

24    JOB NO.:       6788338

25    PAGES 102-108 ARE CONFIDENTIAL
```

                                          Page 1

| | |
|---|---|
| 1 | A P P E A R A N C E S |
| 2 | ON BEHALF OF PLAINTIFF KELLY PINN: |
| 3 | ETHAN PRESTON, ESQUIRE (by videoconference) |
| 4 | Preston Law Offices(TX) |
| 5 | 4054 McKinney Avenue, Suite 310 |
| 6 | Dallas, TX 75209 |
| 7 | ep@eplaw.us |
| 8 | (972) 842-4666 |
| 9 | |
| 10 | ON BEHALF OF DEFENDANTS CONSUMER CREDIT CONSULTING |
| 11 | FOUNDATION INC., NATIONAL BUDGET PLANNERS OF SOUTH |
| 12 | FLORIDA, INC., AND ISHWINDER JUDGE: |
| 13 | SETH W. WIENER , ESQUIRE (by videoconference) |
| 14 | Law Office of Seth W. Wiener |
| 15 | 609 Karina Court |
| 16 | San Ramon, CA 94582 |
| 17 | seth@sethwienerlaw.com |
| 18 | (925) 487-5607 |

E X H I B I T S (Cont'd)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 14 | Missing CCCF Email Spreadsheet | 65 |
| Exhibit 15 | Email from Mr. Wiener 9/25/23 | 68 |
| Exhibit 16 | Porus Report 2021 | 71 |
| Exhibit 18 | Email from Mr. Engineer | 71 |
| Exhibit 20 | Email RE: Past Due Invoices | 75 |
| Exhibit 21 | Email with Excel Spreadsheet | |
| | Attached, 6/2/22 | 76 |
| Exhibit 22 | Email Chain, 8/3/21 | 77 |
| Exhibit 25 | Defendants' Document Production | |
| | CCCF 0002 | 80 |
| Exhibit 28 | Joint Discovery Letter | 89 |
| Exhibit 29A | Microsoft Website Exporting | |
| | Instructions | 84 |
| Exhibit 29 | 7/8/24 Email with Attachments | 89 |
| Exhibit 30 | Excel Copy of DMS Call Records | 91 |
| Exhibit 31 | Organization Charts, CCCF 239, 264 | 96 |
| Exhibit 32 | Employee Email Addresses | 96 |
| Exhibit 33 | Confidential | 101 |
| Exhibit 34 | Sales Pay Structure | 105 |
| Exhibit 35 | Compensation Policy | 106 |

I N D E X

| EXAMINATION: | PAGE |
|---|---|
| By Mr. Preston | 8 |
| By Mr. Wiener | 109 |

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Order on Joint Discovery Letter | 28 |
| Exhibit 2 | CCCF Defendant's Second Amended | |
| | Responses | 34 |
| Exhibit 3 | Third Discovery Letter | 37 |
| Exhibit 5 | Court Order RE: Production of | |
| | Documents | 43 |
| Exhibit 6 | Declaration from Microsoft | |
| | Corporation | 45 |
| Exhibit 7 | Email from Mr. Preston to | |
| | Mr. Wiener | 45 |
| Exhibit 8 | Third Amended Response to Request | |
| | for Production 30 | 48 |
| Exhibit 9 | Declaration of Ishwinder Judge | 49 |
| Exhibit 10 | Declaration of Porus Engineer | 52 |
| Exhibit 11 | Email Exchange Dated 7/27/23 | 58 |
| Exhibit 12 | Supplemental Declaration 8/23/23 | 62 |
| Exhibit 13 | Email from Mr. Preston to Mr. | |
| | Wiener | 65 |

| | |
|---|---|
| 1 | QUESTIONS INSTRUCTED NOT TO ANSWER |
| 2 | PAGE    LINE |
| 3 | 46     18 |
| 4 | 60     5 |
| 5 | 61     8 |
| 6 | 62     9 |
| 7 | 63     3 |
| 8 | 69     6 |
| 9 | 72     1 |
| 10 | 72     13 |

2 (Pages 2 - 5)

Veritext Legal Solutions
800-336-4000

**Page 14**

1  we could do for this client, and that is based upon a
2  predetermined numbers that we have with the creditors,
3  because creditors work with us.  We are partners.
4  They're partners with nonprofit credit counseling
5  agencies like us.
6        So give you an example, like, with Chase, just
7  as an example, if the client has a Chase account, and
8  they are paying 23 percent on their credit card, by
9  being on the debt-management program, Chase would lower
10  that to around 6 percent, depending on a tier, again,
11  based on their financial analysis that we do, as to what
12  kind of a drop in interest rates the creditor will offer
13  this client.
14        So we do -- we take in each creditor, and
15  based on each creditor, we tell the client, "Okay.
16  Based on this, you will be able to save this much money,
17  because it looks like you are -- from the budget
18  picture, that you are negative X amount."  So first,
19  we'll recommend them to cut expenses to make sure that
20  the budget comes in line so that they can make the
21  credit card payments.
22        So a lot of stock goes into what expenses the
23  client should be cutting.  And the first things we look
24  at is discretionary, because fixed and variable is
25  second and the third.  So we look at the discretionary,

**Page 15**

1  where they're spending.  Are they spending too much?
2  Are their habits, spending habits, out of ratios?
3        And then based on that, we, we come up with,
4  if their credit card payment is affordable, we will then
5  tell them that, "Hey, by being on the debt-management
6  program, you can afford to pay this much amount."
7        And then every single month, then we go into
8  the payments aspect on how the program will work, where
9  every month the client makes that payment to us.  So
10  let's say that the client has Chase, Bank of America,
11  and Citi, and they will make one payment, and that one
12  payment will come into our trust account.
13        And then we will take that payment and
14  disperse that payment out to all -- all the three
15  creditors, which is Chase, Citi, and Bank of America.
16  And then every single month, that continues.  These
17  programs are based on a 60-month term, so the client has
18  to pay the entire debt off in 60 months.  It's a
19  creditor guideline.
20        And so that starts depending on when the
21  client wishes to start, when their due dates are.  So we
22  will take all that information, and then it goes into
23  the payments aspect.  So talked about the counseling
24  aspect.  From the counseling aspect, then it goes into
25  the payments.

**Page 16**

1        And then after the payments, what we
2  continuously do with this client is engage with them on
3  the educational component of it, which is why did the
4  client in the first place get into debt?  What were the
5  root causes of it?  And then our counselors will, on a
6  monthly basis, reach out to these clients and do a lot
7  of education.
8        We do -- we have a outreach component of our
9  business where, in our local neighbor -- local
10  community, people will refer clients over to us.
11  Mortgage people who, their clients will buy a house and
12  they cannot afford it because they have credit card
13  debt, they have to first pay down that debt.
14        So those clients get referred to us.
15  Creditors would refer clients to us because they cannot
16  do this holistic counseling that we do and to help the
17  client.  So if a client calls a creditor to -- since
18  they're not able to make the payment, the creditor will
19  actually tell them to reach out to a certified credit
20  counseling agency like us.
21        And then we would then counsel this client, go
22  through this entire budget sheet, and all of this
23  information be submitted to the creditor.  So the
24  creditor evaluates it based on our credit counselor's
25  budget sheet and how we have come up with this financial

**Page 17**

1  picture for them, and why is it that this client
2  qualifies for this program.
3        In some cases, the client -- so we -- so the
4  counseling aspect is part of the operations.  So the
5  payments component is part of the operations, and yeah.
6  So all of that is what operations is.  And I help out
7  with the day-to-day operations.  They have managers
8  under us.  We have a small team, and that's what
9  operations is.
10     Q   Okay.  I have some follow up questions, but I
11  think I want to focus on you right now.  When you say
12  you run operations, and I hear that there's, you know, a
13  counseling bucket, a payment bucket, and an education
14  bucket.  What is your personal involvement in
15  counseling?
16     A   I oversee all aspects of that.  I mean all the
17  three buckets.  There are individual managers that are
18  responsible for the individual, but overall, it -- I'm
19  responsible for the day-to-day daily operations.  All
20  the issues would come to me.
21     Q   So other than things that are escalated to you
22  by the managers, what do you do with respect to
23  counseling?
24     A   Like, actually do the counseling?  I did not
25  understand the question.

1    Q   Well, I don't know that you would actually do
2  the counseling, but I guess I'm trying to understand
3  what it is you do, beyond handling matters that are
4  escalated to you by the managers.
5    A   Sure.  So you asked about the operations, but
6  that's essentially the operations.  But now, in terms of
7  my role, we are a ISO 9001 certified organization.  We
8  have to be.  It's part of a requirement, and what has to
9  happen is we have these policies and procedures, and
10  then we have annual audits.
11       It's a third-party, independent audit
12  that -- that happens.  And throughout the year, we kind
13  of take every aspect of our organization and we have to
14  audit it.  So that's a big part of my role.  And all of
15  those components entail those buckets that I mentioned.
16  So you kind of audit those counseling.
17       You are kind of auditing the payments.  You're
18  kind of auditing -- overseeing the outreach counseling.
19  You're kind of -- I'm responsible for making sure that
20  all of that is included into the internal audits that we
21  do for ISO.
22    Q   Okay.  I want to make sure I got that right.
23  The ISO 9001?
24    A   That is correct.
25    Q   Certification?

Page 18

1    A   Yes, sir.
2    Q   Okay.  And who is the auditor?
3    A   It's B-S-I.
4    Q   B-S-I.  What does that stand for?
5    A   British Standards International.  It's
6  actually said as "International Standards," but it's
7  British Standards -- British Standards International, I
8  think.  So they are the organization that actually
9  certifies organizations for ISO.
10    Q   And so BSI actually, I guess, comes to CCCF
11  and audits CCCF's operations?
12    A   That is correct.
13    Q   Okay.  So beyond handling escalated matters
14  and the ISO certification, what else do you spend your
15  time doing while working at CCCF?
16    A   What else do I do other than operations, ISO,
17  day-to-day escalations?  We also have to monitor -- we
18  are part of -- again, but that also comes under the ISO
19  umbrella and what I have to do for auditing.  There are
20  certain metrics that we have to do for ISO.
21       So we are kind of overseeing, or I'm
22  overseeing some metrics on, you know, calls, and how
23  many calls we got, and are the calls being answered.
24  Although, what else am I missing?  Well, I also set up
25  our referral partnerships.

Page 19

1       So we have our -- the way the clients come
2  in -- so most of our people, most of our clients, you
3  know, would find us either through a referral or either
4  through our website, so I manage that as well.
5    Q   Okay.  So you manage referrals, the referral
6  network as well?
7    A   Yes.
8    Q   Does that include telemarketing?
9    A   "Telemark"?  What is telemarketing?
10    Q   People making calls.
11    A   We don't do that.  We do not do any of that.
12    Q   All right.  Do you hire telemarketers?
13    A   No, we do not.
14    Q   So no one makes calls for CCCF?
15    A   So our referral partners, they would be doing
16  the marketing or whatever they do, and they refer
17  clients to us.
18    Q   Do any of those referral partners make
19  telephone calls to prospective customers?
20    A   I would think so.
21    Q   Okay.
22       MR. WIENER:  Mr. Engineer, do not
23  speculate.  If you don't know for sure, don't venture a
24  guess unless you're asked to do so.
25       THE WITNESS:  Okay.

Page 20

1  BY MR. PRESTON:
2    Q   Who do you report to?
3    A   I report to the board.
4    Q   And who's on the board?
5    A   There is a president, and there are three
6  other gentlemen.  But mostly --
7    Q   Can you name who's the --
8    A   Ishwinder Judge.
9    Q   Okay.  Who reports to you?
10    A   So I mentioned about those three buckets.  So
11  whoever -- we have a person who manages our ISO, which
12  is a quality manager.  We have a counseling team, a
13  payments team.  They all report to me.
14    Q   Okay.  Who's in charge of the counseling team?
15    A   Reggie -- Reginald Sternberg.
16    Q   Okay.  Who's in charge of payments?
17    A   It's -- it's all comes under Reginald.
18  He -- he kind of oversees payments as well.  Then we
19  have the quality -- sorry?
20    Q   Okay.  Yeah.  You're answering what I was
21  going to ask.
22    A   I'm sorry?
23    Q   The quality manager.
24    A   Yeah.  That one is -- is Jaime Wong
25    Q   When a customer does not qualify for a

Page 21

1    Q   Okay.  I'd like to see if you can share your
2  screen, in case we need to do that.
3    A   You want me to click on it?
4    Q   Yep, I do.
5    A   Can you see it?
6    Q   No.  I'm going to put in a URL into the chat.
7  Hopefully everybody can see the chat.  There is a drive
8  there.  I want to make sure everybody can access those
9  exhibits.
10   A   It went, took me to a screen, and system audio
11 recording, privacy, and security.  Did you say I have to
12 go into the chat?
13   Q   Yeah.  Do me a favor and go into the chat.  I
14 put a link there.  I also sent it to Mr. Wiener.
15       MR. WIENER:  Are you able to send link
16 via email?  I just, I was logging on via --
17       MR. PRESTON:  I did.
18       MR. WIENER:  All right.
19       MR. PRESTON:  I did.
20       MR. WIENER:  Great.  Thank you.
21       MR. PRESTON:  I don't want to email your
22 client, but the idea is that he would download exhibits
23 from that Google Drive.
24       MR. WIENER:  All right.  You have Porus's
25 email address already, I believe.

Page 26

1        MR. PRESTON:  Probably, somewhere.  If
2  you give me permission to send the email, I will do
3  that.
4        MR. WIENER:  Sure.  I can send him the
5  same link you just sent to me if it's --
6        MR. PRESTON:  Okay.  I'd prefer that.
7        MR. WIENER:  Okay.  All right.  Porus, I
8  just sent it to you, if you can confirm you got it.
9  It's a Google Drive link.
10       THE WITNESS:  I think I am clicking on
11 the --
12       MR. WIENER:  And it looks like it's only
13 one document.  The Exhibit 1 is --
14       MR. PRESTON:  Yeah, I'm going to add more
15 stuff as we go.  I just don't know what order I'm going
16 to go in.
17       MR. WIENER:  All right.  Porus, you
18 already have it.  Exhibit 1 is -- I'm not sure you have
19 it on your computer, but it's the "Order on Joint
20 Discovery Letter," document number 114.
21       THE WITNESS:  The one I clicked from
22 the -- yeah, it's the joint discovery.  Yes, I have it.
23       MR. PRESTON:  Okay.  Good.  And so you're
24 able to access the drive, and I can upload more stuff?
25       THE WITNESS:  Yes.

Page 27

1        MR. PRESTON:  Okay.
2        MR. WIENER:  And just so you know, I
3  don't know if you have a setting on it, but I'm not able
4  to download the document.
5        THE WITNESS:  I could not -- I could not
6  do it either.  I just clicked on the chat link.
7        MR. PRESTON:  Try now.  Can we go off the
8  record?  I want to make sure we iron this stuff out.
9        THE OFFICER:  Sure.  We are now off the
10 record at 10:56 a.m.
11       (Off the record.)
12       THE OFFICER:  We are now back on the
13 record at 11:01 a.m.
14 BY MR. PRESTON:
15   Q   All right.  So if you can look, this is
16 Exhibit 1, we're going to call it.  If you can look at
17 page three, the last paragraph on that page, "Plaintiff
18 has granted leave to take a Federal Rule of Civil
19 Procedure 30(b)(6) deposition of the CCCF defendants
20 regarding their document and information systems, their
21 search and production for responsive documents, and
22 information and discovery, and whether spoliation of
23 evidence has occurred."
24       (Exhibit 1 was marked for
25       identification.)

Page 28

1    A   Where?  Which one?  I'm -- I -- which page are
2  you on?
3    Q   Page 3, Line 15.
4    A   Page 3.  Okay.  Go ahead.
5    Q   So have you seen this document before?
6    A   Yes.
7    Q   Okay.  Do you understand what the order says?
8    A   This is Line 15.  You want me to read it?
9    Q   No, I don't.  I don't think you -- I read it.
10 I don't think you need to read it.  I just, I wanted to
11 ask you if you understand what it means.
12   A   Hold on.  Let me read.  Okay.  Yes.
13   Q   So you understand that you were designated to
14 testify on behalf of Consumer Credit Counseling
15 Foundation, National Budget Planners, and Tony Judge;
16 correct?
17   A   Correct.
18   Q   Okay.  And you are the director for CCCF;
19 correct?
20   A   Correct.
21   Q   Okay.  What is your relationship with National
22 Budget Planners?
23   A   No relationship.
24   Q   Did you ever have a relationship?
25   A   Yes.

Page 29

8 (Pages 26 - 29)

1    Q   What was that relationship?
2    A   I -- I used to be employed with National
3  Budget Planners.
4    Q   Who was the president of National Budget
5  Planners?
6    A   Boy.  At that time, I believe the name Sanjeev
7  Kanwar.
8    Q   Okay.  What's your relationship with Tony
9  Judge?
10   A   My relationship?
11   Q   Yes.
12   A   I have no relationship.  I'm an employee.
13   Q   So he's your employer?
14   A   Yes.
15        MR. WIENER:  Hold on.  Mr. Engineer, I
16  just want you to verify that you understand that
17  question correctly.
18        THE WITNESS:  If he -- I -- I -- can you
19  repeat that?
20  BY MR. PRESTON:
21   Q   Mr. Judge is your employer?
22   A   Consumer Credit Counseling Foundation is my
23  employer.
24   Q   What was the relationship between CCCF and
25  National Budget Planners?

*Page 30*

1    Q   What did you do?  What did CCCF do to collect
2  documents for this case in May 2023?  Generally, what
3  had it done?
4    A   What did we do in May of 2023?  I
5  would -- that's --
6    Q   Well let me clarify.  Let's back up.  What had
7  CCCF done by May 2023, so up through May 2023?
8    A   Boy.  So what we did in 2022, and what we did
9  in 2023?
10   Q   Yeah.
11   A   Wow.  I wish my memory was that good, but I
12  will try.  I quite can -- I don't know what specifically
13  we did in 2022 and 2023, but I know that we are a small,
14  nonprofit organization, so we did our best
15  to -- whatever the request was that came in, we did our
16  best to fulfill those requests.
17   Q   Can you do me a favor?  I just want to get a
18  sense of the room that you're in.  Can you pick up your
19  laptop, hold it out from you, and then just, kind of,
20  take a spin around so I can kind of see the size of the
21  room that you're in?  Okay.  About how many square feet
22  would you estimate is the office that you're in now?
23   A   I would have no idea.  This office?
24   Q   Let me reframe that.  Yeah.  How many
25  employees does CCCF have?

*Page 32*

1        MR. WIENER:  Objection.  Vague as to
2  time.
3    A   Sorry?
4    Q   What was the relationship between CCCF and
5  National Budget Planners in 2022 and 2023?
6    A   No relationship.
7    Q   So you -- all right.  This is an opportunity.
8  This is a case where there's been a lot of effort to get
9  documents from CCCF and, I guess, National Budget
10  Planners, and I want to, sort of, understand your
11  position on these matters.  And there's been a number of
12  productions in this case.
13        But let's kind of go back.  I think it's a
14  good place to start in May 2023.  What did you guys do
15  to collect documents?
16        MR. WIENER:  Objection.  Overbroad.
17  BY MR. PRESTON:
18   Q   Mr. Engineer, are you reading something?
19   A   No.
20   Q   Can I ask what you're looking at?
21   A   I'm looking at you, on your -- on your
22  picture.
23   Q   Okay.  Did you hear my question?
24   A   I -- I did not even understand.  You said
25  what?  What was the question?

*Page 31*

1    A   Nine.
2    Q   Do do you have a sense of approximately what
3  its budget is?  Like, what is its income?
4    A   I wouldn't just know something like this
5  off -- offhand.  I mean, I would have to look at some
6  documents to answer that question.
7    Q   Okay.  Do you recall where CCF had searched by
8  May 2023?
9    A   I believe we searched -- the request was
10  for -- to search for our emails, so we did that, and we
11  submitted all our search results of what -- what we
12  found.
13   Q   Okay.  So you guys had searched your emails.
14  Do you recall who told you it was -- you were supposed
15  to search your emails?
16   A   Who told us?
17   Q   Uh-huh.
18   A   Well, I think it was -- I -- we -- I don't
19  know who told us.  I don't know the answer to that
20  question, but Seth -- and Seth is working with us, so we
21  just follow Seth's direction.
22   Q   Okay.  Did you search anywhere else besides
23  the emails?
24   A   Yes.  I searched, I believe, my computer, and
25  also, I believe -- I don't know when, but at some point

*Page 33*

**Page 34**

1   we did search even Ishwinder Judge's computer.

2   Q   Okay.  Did you take any steps to confirm that

3   the search was complete?

4   A   What would those steps be?  I mean, we just

5   search, and whatever shows up is what shows up.  What

6   step would that be?  I don't know.

7   Q   Okay.  Okay.  Well, what I mean to say is, did

8   you ever do anything to confirm that there were no

9   documents missing?  Had you done that by July 2023?

10   A   Well, the -- I don't think there's a

11   particular button that you click to confirm that you did

12   everything.  We just searched for particular names, and

13   whatever showed -- came in is what came in, and then we

14   submitted all of that information.

15   Q   Okay.  I'm uploading a new document.  This is

16   the most recent response to the discovery served in this

17   case by Plaintiff.  If you could, do you recognize this

18   document?

19   A   The one I have open, the joint discovery?

20   Q   No, it's a new document.  If you could take a

21   look at the Google Drive.  This is Exhibit 2.  We're

22   moving on to a different exhibit.

23       (Exhibit 2 was marked for

24       identification.)

25   A   One second.

**Page 35**

1       MR. PRESTON:  Let's go off the record, so

2   you have an opportunity to kind of look this over.  Make

3   sure you get it and look it over.

4       THE OFFICER:  Okay.  We are now off the

5   record.

6       MR. PRESTON:  Is that all right?

7       THE OFFICER:  We're off the record at

8   11:13 a.m.

9       (Off the record.)

10       THE OFFICER:  We're now back on the

11   record at 11:17 a.m.

12   BY MR. PRESTON:

13   Q   Okay.  Do you recognize this document?  Have

14   you seen this before?

15   A   This -- the entire document?

16   Q   This is the -- yeah.  This is the "Defendant's

17   Second Amended Responses to the Plaintiff's Document

18   Requests."

19   A   Okay.

20   Q   You do recognize it?

21   A   Well, it's just so far back, but I don't.  I'm

22   sure Seth has gone over this with me at some point.

23   Q   Okay.  Take a look at Requests 2 and 3 in

24   particular.  Were these your words?  Were you involved

25   in writing these responses?

**Page 36**

1   A   By "responses," you mean on the 26, Line 26?

2   Q   This document, did you -- Exhibit 2.  Were you

3   involved in writing the responses in Exhibit 2?

4   A   Exhibit 2?  When you say "Exhibit 2," it's

5   Line 26; correct?

6   Q   I mean the whole PDF.

7   A   Oh, no.

8   Q   Okay.  So you didn't write this?

9   A   No.

10   Q   Do you know if anybody at CCCF did?

11   A   Again, you are saying the -- on the line

12   item I'm reading is, "Defendants object to this request

13   on the grounds that" --

14   Q   No, sir.  I'm talking -- I'm sorry.  I'm

15   sorry.  I'm talking about the entire document.  Okay?

16   A   Yeah, the -- again, I just -- the entire

17   document is "CCCF Defendant's Second Amended Response

18   Production of Documents PDF," which has, "The United

19   States Court."  This entire document?

20   Q   Yes.  My question is whether or not anybody at

21   CCCF was involved in writing this document, or preparing

22   it?

23   A   No.

24   Q   Okay.  Let's go look at the response to

25   Document number 3.  So that is page 3, Line 8.

**Page 37**

1   A   Okay.  I'm there.

2   Q   Was this response complete and correct at the

3   time it was signed?

4   A   I don't know.

5   Q   Okay.  Do you know when it was signed?

6   A   Sorry, I don't remember.

7   Q   Okay.  All right.  So I want to get another

8   document uploaded.  So we're moving on to a new

9   document.  It's Document number 3.  All right.  Can you

10   look at -- it should be uploaded and accessible now.

11   Can you see Document number 3?

12       (Exhibit 3 was marked for

13       identification.)

14   A   Not yet.

15       MR. PRESTON:  Why don't we --

16       THE OFFICER:  Should we go off the

17   record?  Should we go off the record?

18       MR. PRESTON:  Yeah.

19       THE OFFICER:  Okay.

20       MR. WIENER:  I actually think that we

21   should be staying on the record.  To me, that's part of

22   the deposition time, if he has to go through numerous

23   documents.

24       MR. PRESTON:  He's taking about 30

25   seconds to answer each question, Seth.

1     MR. WIENER:  I'm not sure how to -- I
2  mean, do you consider it long or short or --
3  BY MR. PRESTON:
4     Q   Can you look at page 5?
5     A   Okay.  I am on page 5.
6        MR. PRESTON:  Okay, let's go back on the
7  record.
8        THE OFFICER:  Okay.  We're on the record
9  at 11:23 a.m.
10  BY MR. PRESTON:
11     Q   Okay.  On page 5, this is ECF number 64, and
12  Exhibit 3 to this deposition.  On page 5, there's a
13  representation about what you would testify to.  Do you
14  see what I'm talking about?
15     A   No.  Which?  Where?  What -- what am
16  I -- which?  Where should I be reading?
17     Q   So there's a bullet point that says --
18     A   "RPD 22."
19     Q   Yeah.  Okay.  So below that is a paragraph.
20  At the end of that paragraph, it says, "Mr. Engineer
21  will testify as follows."
22     A   Yes, I read that.
23     Q   Okay.  There is a paragraph below.  Do you
24  recognize this language?
25     A   "CCCF received referral calls via a

Page 38

---

1  you do swear to the truth of these three inset
2  paragraphs on page 5 of the Exhibit 3 here, this ECF
3  number 64?
4     A   Yes.
5     Q   Okay.  It says, "CCF [sic] received referral
6  calls via a live-transfer call from DMS."  How did you
7  guys receive these calls?  Was it just a straight, plain
8  old telephone system call?
9     A   Yes.
10     Q   Was any other data given to CCCF besides the
11  voice recording or the voice call, voice connection?
12     A   What -- can you explain more on what you mean
13  by -- what other data would that be?  It was just a
14  call.
15     Q   Okay.  So some VoIP systems will transfer over
16  additional information, demographic information, during
17  a transfer.
18     A   No.  No.  No.
19     Q   Okay.  Then it says, the second paragraph,
20  "DMS had its own portal for all clients that were sent
21  by DMS to CCCF;" is that correct?
22     A   Correct.
23     Q   Okay.  How do you know that DMS has a portal?
24     A   Several times, they would -- they would send
25  us a link to access their portal with information.

Page 40

---

1  live-transfer call from DMS."  That's the line?
2     Q   Yeah.  That entire inset text, and I guess
3  it's three paragraphs, inset paragraphs, is that all
4  true and correct?
5     A   Let me just read it.  Yes.  After you're done
6  asking, if you don't mind, I would like to take a
7  ten-minute break to just hit the restroom.
8     Q   Sure, that's fine.
9     A   Just let me know when.  I mean, if you're in
10  the middle, I don't want to --
11        MR. PRESTON:  Let's go off the record
12  now.
13        THE WITNESS:  Oh, okay.  I'll be back.
14        THE OFFICER:  Okay.  We are now off the
15  record at 11:26 a.m.
16        (Off the record.)
17        THE OFFICER:  And we are now back on the
18  record at 11:33 a.m.
19  BY MR. PRESTON:
20     Q   All right.  So let's look at page 5 of Exhibit
21  3, which is another joint discovery letter dated May
22  26th, 2003 [sic].  And that first inset paragraph
23  says -- first off, let me back up.  It says,
24  "Mr. Engineer will testify as follows."  I just want to
25  make sure that you're willing to swear to the truth, or

Page 39

---

1     Q   Would they do that on request?
2     A   I quite don't remember how they would do it or
3  when they would do it, because it was such a long time
4  back, but I remember that they would -- they -- the --
5  the reason they had it, because they would -- everything
6  was -- the calls came from them, so they were
7  maintaining them.
8     Q   Okay.  So they could provide you access to the
9  portal?  DMS could provide you access to their portal?
10     A   Correct.
11     Q   Okay.  Does CCF [sic] have access to any other
12  portal at DMS?
13     A   Any other portal?  No.  This was just -- well,
14  whatever they would send us, it would be, like, an -- by
15  portal.  It would be an Excel sheet or what our
16  system -- DMS used.  I don't quite remember what it is,
17  but that -- that would be the only way we would get
18  access to.
19     Q   So you have in the past accessed DMS's portal
20  via links that DMS sent you?
21     A   I -- I -- it's -- I believe so, yes.
22     Q   Okay.  Do you remember who sent you those
23  links?
24     A   It -- there were several of them.  It could
25  be -- I -- I quite don't remember who particularly would

Page 41

Page 42

```
 1   send it, but it would be from them.
 2      Q   From DMS?
 3      A   Correct.
 4      Q   Okay.  It says here that DMS's portal
 5   generated spreadsheets; is that correct?
 6      A   I think the portal was kind of a spreadsheet.
 7   If they called it "portal" or whatever it is, it is the
 8   same thing, I think.
 9      Q   Well, a portal is something you access with a
10   browser.  A spreadsheet is something you access with
11   Microsoft Excel or something similar.  Did you ever see
12   spreadsheets generated by DMS'S portal?
13      A   I -- it is such a long time back.  I quite
14   don't know if it is a -- it -- I think it was an
15   Excel-type spreadsheet that DMS would -- DMS would send.
16      Q   Okay.  I'm going to upload three other
17   documents.  All right.  So there's a Exhibit 5 and an
18   Exhibit 6.
19      A   I am on 4.
20      Q   Yeah, skip 4.  Go to 5.
21      A   I quite have not gotten 5 yet.  Okay.  I am on
22   5.
23      Q   Okay.  So the last page of 5, the
24   court -- Exhibit 5 is ECF 86.  It is a court order and
25   it requires the filing of a sworn declaration regarding
```

Page 43

```
 1   the defendants' production of documents.  Do you
 2   recognize this document?
 3           (Exhibit 5 was marked for
 4            identification.)
 5      A   Let me just read it.  Yes.
 6      Q   Okay.  When did you see it first?
 7      A   I quite don't remember when.  I would have no
 8   idea when.  I mean, it's too broad.
 9      Q   All right.  Let's go to -- I'm going to upload
10   another document, but quickly look at Exhibit 6, which
11   is a declaration from Microsoft Corporation in
12   response --
13           (Exhibit 6 was marked for
14            identification.)
15      A   Open up Exhibit 6?
16           MR. WIENER:  I believe that's Exhibit 7.
17   Or no, Exhibit 6 is from Microsoft.  I'm sorry, yeah.
18           THE WITNESS:  Which one?  Six or seven?
19   BY MR. PRESTON:
20      Q   Six.
21      A   I'm on 6.
22      Q   Okay.  In the Paragraph six, it discusses
23   obtaining header information for certain email accounts.
24   Do you recognize any of those email accounts?
25      A   Exhibit 6?  Yes.  Point 6?  Yes.
```

Page 44

```
 1      Q   Okay.  There's a Hotmail account, Shiv Johar.
 2      A   Yes.
 3      Q   Do you recognize that email account?
 4      A   Yes.
 5      Q   Who is that?
 6      A   He was somebody that worked with DMS.
 7      Q   Was he a DMS employee?
 8      A   I would have no idea.
 9      Q   Okay.  What did he do for DMS?
10      A   I would have no idea, but he worked with them.
11   He used to -- he know -- he knew them, and he had some
12   way that he was linked with them.  I don't know what,
13   how, or what relationship.
14      Q   Okay.  How long have you known -- what's his
15   name?
16      A   Shiv Johar.
17      Q   Shiv Johar.  How long have you known
18   Mr. Johar?
19      A   How long have I known him?  Probably from the
20   time that we engaged with -- he's the one who engaged
21   DMS, so from the time that we knew DMS, I would think.
22      Q   So.  Did DMS introduce you to Mr. Johar?
23      A   I don't remember if they -- if DMS introduced
24   him or he introduced DMS.  I -- I don't quite know, but
25   he was from DMS.
```

Page 45

```
 1      Q   Did you have a relationship with Mr. Johar
 2   outside of DMS?
 3      A   No.
 4      Q   Did you have a relationship with Mr. Johar
 5   prior to working with DMS?
 6      A   I mean, before DMS?
 7      Q   Yes,
 8      A   He would -- he would be associated with some
 9   other company in the past, but I don't quite know, quite
10   remember if he worked with some other companies like
11   DMS.  But he was the one that introduced us to or he was
12   associated with DMS.
13      Q   Okay.  What did Mr. Johar do for DMS?
14      A   I would have no idea.
15      Q   You don't know what Mr. Johar did
16   for -- sorry.  What did Mr. Johar do for CCCF?
17      A   Nothing.  He had nothing to do with CCCF.
18      Q   Did he arrange telemarketing?  Did he arrange
19   transfers to CCCF, transferred calls?
20      A   He -- no.  He only worked with DMS, and DMS is
21   the one that did that.
22      Q   Okay.  Let's go to Exhibit 7.
23      A   Yeah.
24           (Exhibit 7 was marked for
25            identification.)
```

1    Q   Have you seen this email before?
2    A   This is last -- I don't remember, but it -- it
3   was a year ago, more than a year ago, but --
4    Q   Okay. So this is an email from myself to
5   Mr. Wiener, in which I told him that the email headers
6   that Microsoft had produced were in -- some of those
7   email headers were missing, or some of the emails that I
8   had found where I had email headers from Microsoft were
9   not in CCCF's production. Do you see that there's a zip
10  file which contained a whole bunch of missing headers?
11   A   In this email? I don't see it.
12   Q   No. It's listed as an attachment. I didn't
13  include all the emails as an attachment to the PDF. Do
14  you recall being told that Plaintiff's counsel had
15  identified missing emails in this case?
16       MR. WIENER: I'm going to move to strike.
17  That clearly invades the attorney-client privilege.
18  Also, I'm not going to have the witness answer any
19  questions if you're going to show him an incomplete
20  email. You can move on to the next question.
21  BY MR. PRESTON:
22   Q   When do you recall learning that Plaintiff's
23  counsel in this case had identified missing emails?
24       MR. WIENER: Objection. Assumes facts
25  not in evidence.

Page 46

1        MR. PRESTON: That's nice.
2   BY MR. PRESTON:
3    Q   You can answer.
4    A   I'm sorry. What was the question again?
5    Q   When do you recall learning that the
6   plaintiff's counsel in this case had identified emails
7   that were missing from the document production that
8   Defendants made?
9        MR. WIENER: Objection. Assumes facts
10  not in evidence. Vague and ambiguous. Irrelevant.
11   A   Based on my record --
12       MR. PRESTON: I don't think the
13  court -- okay. I'm going to tell you, Seth, I don't
14  think that first court order leaves any doubt about the
15  relevance. Proceed as you like.
16       MR. WIENER: All right. Withdraw the
17  objection. I'm going to maintain the other objections.
18  BY MR. PRESTON:
19   Q   Okay. Let's look at Exhibit 8. The first
20  page is a "Third Amended Response to Request for
21  Production 30." In the response to Request for
22  Production 30, it references a diligent and reasonable
23  inquiry with respect to certain financial documents for
24  Ishwinder Judge. Do you know who did this search?
25  //

Page 47

1        (Exhibit 8 was marked for
2        identification.)
3    A   Search for document number 30?
4    Q   Yes.
5    A   I quite don't remember who -- who searched for
6   this document, number 30, is what the question is?
7    Q   Yes.
8    A   I quite don't recollect who did the search,
9   but --
10   Q   It says, "During the period from July 12,
11  2018, Ishwinder Judge's sources of compensation have
12  been from FJC and RJC, LLC, which own and operate a
13  Denny's and a Buffalo Wild Wings franchise restaurant."
14  Do you know if this statement is accurate?
15   A   Yes.
16   Q   How do you know?
17   A   Because I -- they -- they do have -- that's
18  what Ishwinder Judge -- they have franchise restaurants.
19   Q   Do they have any other sources of
20  compensation?
21   A   No.
22   Q   How do you know?
23   A   They could have. I mean, I'm talking about
24  the franchise restaurant is what I know.
25   Q   All right. All right. So let's look at

Page 48

1   Exhibit 9. Who drafted this declaration? Do you know?
2        (Exhibit 9 was marked for
3        identification.)
4    A   This document?
5    Q   Yes. Exhibit 9.
6    A   This whole "United States District"?
7   Not -- the whole document?
8    Q   No, the substantive portions, the paragraph on
9   page 2. And do you know who drafted this language on
10  page 2?
11   A   I don't remember who drafted it. If -- if
12  anything, Seth should. Seth probably would know.
13   Q   Okay. So Mr. Judge made a declaration on
14  behalf of National Budget Planners. What was his
15  relationship with National Budget Planners?
16   A   No relationship, as far as I know.
17   Q   Okay. How did he have knowledge of the facts
18  relevant to National Budget Planners?
19   A   I have no idea.
20   Q   What was the difference between National
21  Budget Planners' records and CCCF's records? Did they
22  keep separate records?
23   A   It's a completely different company. It has
24  nothing got to do with them. I have no idea, so that is
25  completely separate.

Page 49

13 (Pages 46 - 49)

1    Q    So why would Mr. Judge make a declaration for
2  National Budget Planners?
3    A    I have no idea.
4    Q    Paragraph 3, it says, "NBP implemented a
5  non-deletion policy for electronic mails and other
6  documents."  Do you see that?
7    A    Page 1?
8    Q    Page 2, Paragraph 3 of the declaration.
9    A    Yes.
10    Q    Okay.  How did he do that if he had no
11  relationship with National Budget Planners?
12    A    I would not know.
13    Q    The next paragraph, Paragraph 4, it says, "The
14  defendants have produced an electronic recording of
15  Pinn's calls with CCCF."  Why does NBP have a recording
16  of that call?
17    A    I don't know.  Which one are you -- what are
18  you talking -- which paragraph are you talking about?
19    Q    The last sentence in Paragraph 4.
20    A    It says, "Pinn's call with CCCF."  That's the
21  one?
22    Q    Yes.
23    A    And what was the question?
24    Q    Why does NBP have a copy of the recording of
25  that telephone call?

Page 50

1  last sentence of that inset paragraph on Paragraph five,
2  it says, "The security manager will be responsible for
3  this policy."  Who is the security manager?
4    A    I have -- I would not know.
5    Q    Okay.  Who enforces these policies?
6    A    Most of our policies are all to do with ISO
7  9001.  That's how all our policies are tied in to
8  everything, and that's what gets audited.  So I wouldn't
9  know who's responsible, but in ISO, we follow -- since
10  we follow a standard ISO protocol of policies and
11  procedures, it's all included as part of that.
12    Q    Okay.  So NBP and CCCF suspended deletion of
13  documents in July 2022; is that right?
14    A    Suspended in July '22?  I -- I wouldn't -- I
15  don't recall.  I don't know.
16    Q    Okay.  Look at Paragraph 6, the second
17  sentence.  "NBP did encounter certain technological
18  issues relating to the retrieval of its archived
19  emails."  What were those technological issues?
20    A    I quite don't remember, since it was such a
21  long time back.
22    Q    Okay.  Let's go on to Exhibit 10.  Do you
23  recall drafting this declaration?
24         (Exhibit 10 was marked for
25          identification.)

Page 52

1    A    I would not know.
2    Q    So going to the start of Paragraph 4.  It
3  talks about NBP's information technology department.
4  Who was that?
5    A    Most of the stuff was all me.  It was myself.
6    Q    Who else was involved?
7    A    Nobody else.
8    Q    Has anybody else looked for documents for this
9  case besides yourself?
10    A    No.
11    Q    So Paragraph 5 describes NBP's disaster
12  recovery and security policy that contemplates deletion
13  of emails after 60 days.  Do you see that?
14    A    Yep.
15    Q    Okay.  Who created this policy?
16    A    I would not know.
17    Q    Does it cover all email, or just email with
18  clients?
19    A    Does it have all emails or emails with
20  clients?  It's too broad.  I mean, I -- I wouldn't know.
21    Q    Well, email with NBP's clients would just mean
22  people who had agreed to counseling.  All email would
23  mean internal email among NBP and anybody else.
24    A    I would not know.
25    Q    So you don't know if -- well, who is -- the

Page 51

1    A    I have not even opened --
2    Q    I mean the language in it, the Paragraphs 1
3  through 6.
4    A    I have it open now.  What was the question?
5    Q    Looking at the language on page -- this is
6  your declaration.  It's ECF number 89, and looking on
7  the second page.
8    A    Okay.
9    Q    The text there in Paragraphs 1 through 6, do
10  you recall who wrote this language?
11    A    Recall who wrote this?  It would probably be
12  Seth working with me on this.
13    Q    Okay.  So in Paragraph 3, it says,
14  "Immediately upon receiving notice of the above
15  captioned lawsuit, CCF [sic] implemented a non-deletion
16  policy."  And it looks like the notice was on July 12,
17  2023; is that correct?
18    A    It's such a long time.  I -- I don't recall,
19  recollect 2022.  It's been two years.
20    Q    Okay.  Sure.  So to correct, on Paragraph 2,
21  it talks about this email from Haley Jones-Partilla on
22  July 12, 2023.  It should actually be July 12, 2022;
23  correct?
24    A    I have no idea.  Who is this attorney?
25    Q    Sir, this is your declaration.

Page 53

14 (Pages 50 - 53)

| | |
|---|---|
| 1     A   No. | 1   standard policy, so it's -- it's included into that. |
| 2        THE WITNESS: But who is this, Seth? I | 2   All of our policies and procedures are part of that. |
| 3   mean, Seth might know who this is because -- | 3     Q   All right. Paragraph 6, the first sentence |
| 4   BY MR. PRESTON: | 4   says, "No information relevant to this lawsuit has been |
| 5     Q   So she is not your counsel? | 5   deleted between July 2022 and the present;" is that |
| 6     A   Haley? Who is this? | 6   still correct? |
| 7        THE WITNESS: Seth, you probably would -- | 7     A   Correct. |
| 8   BY MR. PRESTON: | 8     Q   What about audio recordings? |
| 9     Q   I don't know. So just to confirm -- | 9     A   What about audio recordings? |
| 10        MR. WIENER: I would object. A lot of | 10     Q   Does CCCF keep its audio recordings which are |
| 11   times, they receive automatic notices from attorneys | 11   relevant to this lawsuit? |
| 12   shopping for business. So it would make sense that he | 12     A   Yes. CCCF keeps the audio recordings, but we |
| 13   doesn't know it. | 13   keep it only for a 60-day duration. |
| 14        MR. PRESTON: The question about who she | 14     Q   Okay. So after 60 days, the audio recordings |
| 15   is, I don't know that I actually asked that. | 15   are all deleted? |
| 16        THE WITNESS: I thought you asked who | 16     A   No, no. Nothing is ever deleted. No, no. |
| 17   this attorney is, but I'm sorry. I -- I -- that's why I | 17   Nothing is deleted. It just rerecords it over it, |
| 18   said I don't know. | 18   because we are a -- we are a very small, nonprofit |
| 19   BY MR. PRESTON: | 19   organization and each -- like I explained to you in your |
| 20     Q   Okay. So she is not your counsel? She does | 20   first question that you had asked me on operations on |
| 21   not represent any of the attorneys -- or sorry, any of | 21   what the counselor does, each call with these counselors |
| 22   the defendants in this case? | 22   that interacts with a potential client is anywhere |
| 23        THE WITNESS: Seth, do you? I -- I | 23   between 120 minutes to 180 minutes. And it's very |
| 24   don't -- I don't recognize that name, Seth. So maybe | 24   extensive, these --  these calls. |
| 25   Seth can look at it. I don't know if somebody else | 25     Q   I recall that. I recall that. |
| <div align="right">Page 54</div> | <div align="right">Page 56</div> |
| 1   knows. | 1     A   I'm trying to -- |
| 2   BY MR. PRESTON: | 2     Q   I'm just asking about the recordings. |
| 3     Q   ==Okay. You don't need to spend any more time== | 3     A   Yes. |
| 4   ==on that. I just want to ask, did the defendants stop== | 4     Q   And whether or not they're still available. |
| 5   ==deleting things in July 2022 or in April 2022, when== | 5     A   So every 60 days, these recordings get |
| 6   ==Ms. Pinn made her complaint?== | 6   rewritten on our round robin. So it's -- the 60th day |
| 7     A   ==The question is whether we did it in April or== | 7   gets overwritten again and again and again, because |
| 8   ==July? I quite don't recollect which -- when we did it.== | 8   otherwise, we would have to have terabytes of space to |
| 9     Q   Okay. On Paragraph 4, it describes a search | 9   store these recordings, so it gets overwritten every 60 |
| 10   by CCCF's information technology department. Who is | 10   days. If you don't mind, I would request that it's |
| 11   that? | 11   12:15. Can I take a lunch break? |
| 12     A   That would also be me. | 12     Q   Sure. |
| 13     Q   Okay. And nobody else? | 13     A   And we can resume at 1:15. |
| 14     A   No. | 14     Q   Do you need an hour lunch break? Sure. |
| 15     Q   Okay. Paragraph 5 describes a disaster | 15     A   It would -- it would be ideal if I could just |
| 16   recovery and security policy that appears to be the same | 16   go and grab a bite. |
| 17   as NBP, and do you know who created that disaster | 17     Q   That's fine. |
| 18   recovery and security policy? | 18     A   If that's okay with you. I would take -- I'll |
| 19     A   It's probably created a long time back, so I | 19   be back at 1:15. |
| 20   would have no idea. | 20        MR. PRESTON: Okay. Let's go off the |
| 21     Q   Okay. Do you know who the security manager is | 21   record. |
| 22   referenced in Paragraph 5? | 22        MR. WIENER: Thank you. |
| 23     A   No, I don't recollect who it is. | 23        THE WITNESS: Okay. Thank you. |
| 24     Q   Do you know where this policy is kept? | 24        THE OFFICER: Okay, we are now off the |
| 25     A   It is part of the ISO 9001 procedure and | 25   record at 12:14 p.m. |
| <div align="right">Page 55</div> | <div align="right">Page 57</div> |

<div align="right">15 (Pages 54 - 57)</div>

| | |
|---|---|
| 1       (Off the record.) | 1   doesn't make clear what -- |
| 2       THE OFFICER:  Okay.  We are back on the | 2       MR. PRESTON:  No, I don't want to hear |

**Page 58**

```
 1          (Off the record.)
 2          THE OFFICER:  Okay.  We are back on the
 3   record at 1:15 p.m.
 4   BY MR. PRESTON:
 5      Q   All right.  So I'd like you to look at Exhibit
 6   11, which is an email from your counsel, and it's dated
 7   July 27, 2023, and it concerns a July -- if you look at
 8   the bottom there, there's a link to a box.com, and then
 9   there's an email exchange discussing, excuse me, the
10   production.  Did defendants produce new documents on
11   July 20, 2023?
12          (Exhibit 11 was marked for
13          identification.)
14          MR. WIENER:  I'm going to object.
15   There's no way he can recall the exact days that
16   anything was produced.
17          MR. PRESTON:  Well, it's a
18   20(b)(6) -- 30(b)(6) deposition about that specific
19   issue.
20          MR. WIENER:  It's not about the specific
21   issue of what date documents were produced.  That's not
22   a realistic expectation.  If you have a document that
23   shows whether documents were produced on a date, you can
24   ask him.  I mean, if he knows the answer, you can
25   answer.  I just don't think that's a --
```

**Page 59**

```
 1          THE WITNESS:  I think it is way too
 2   broad.  I have no recollection.
 3   BY MR. PRESTON:
 4      Q   Okay.  So you don't recall if there were new
 5   documents produced on July 20, 2023?
 6      A   Specifically on July 2023, specifically on
 7   that date, I have -- I -- I would have no idea, but I --
 8   I believe we have produced so many documents, and yes,
 9   we have produced everything that -- that needed to be
10   produced.
11      Q   Okay.  I want to point out the last answer
12   took 36 seconds.  Is it -- looking at this email, and
13   it's dated July 27th, is it correct that the production
14   is complete as of July --
15      A   Which one?  Which one are you -- which one am
16   I going to looking at?
17      Q   The same email we were talking before, Exhibit
18   11.
19      A   But there are several in there.
20      Q   So the most recent.  Look on page 1, where it
21   says, "Confirmed for a third time."
22      A   Yes.  The first -- first page.  Okay.
23      Q   Yes.  So was Defendants' document production
24   complete as of July 27, 2023?
25          MR. WIENER:  I'm going to object that it
```

**Page 60**

```
 1   doesn't make clear what --
 2          MR. PRESTON:  No, I don't want to hear
 3   it.  You can answer if you like.  Your objections are
 4   reserved.  That's fine.
 5          MR. WIENER:  I'm going to instruct him
 6   not to answer.  That question's stupid, for lack of a
 7   better word.  I mean, you can ask him cogent questions,
 8   or I may end the deposition.
 9          MR. PRESTON:  Based on -- you can do
10   that, but he's going to answer some questions about when
11   stuff was produced and whether it was complete or not.
12          MR. WIENER:  You're going to ask some
13   cogent questions, or he is not going to be able to
14   answer, Ethan.
15          MR. PRESTON:  The questions are fine.
16          MR. WIENER:  They're not fine.
17          MR. PRESTON:  I think you don't like --
18          MR. WIENER:  Asking him if a production's
19   complete and not telling him what production you're
20   referring to is wasting time.
21   BY MR. PRESTON:
22      Q   Defendants' production as of July 2023, was
23   that production complete?
24          MR. WIENER:  Objection.  Vague and
25   ambiguous.  It's unintelligible what production you're
```

**Page 61**

```
 1   referring to.
 2          MR. PRESTON:  All of Defendants'
 3   productions through that date.
 4          MR. WIENER:  Objection.  Same objection.
 5   BY MR. PRESTON:
 6      Q   Was it complete as of July 2023?
 7          MR. WIENER:  All right.  Move on, Ethan.
 8   You're not going to keep on asking the same
 9   unintelligent question.
10          MR. PRESTON:  No, I think I need an
11   answer.
12          MR. WIENER:  We're going to end the
13   deposition if you're going to continue to badger the
14   witness.  And you can go to court and explain why you --
15   don't open your mouth like that.
16          MR. PRESTON:  He hasn't actually answered
17   the question.  It's not an asked and answered.  It's you
18   objecting.  You don't like the answer.  You don't like
19   what's being asked.
20          MR. WIENER:  Right.
21          MR. PRESTON:  That's not the same thing.
22   Badgering --
23          MR. WIENER:  It's unintelligible, and
24   you're not willing -- of course, if you're able to
25   answer his question about what production was complete
```

1  without knowing what production it is, feel free.
2      THE WITNESS:  I have no idea.  Well,
3  how -- am I going to answer this question?
4  BY MR. PRESTON:
5      Q   Okay.  Do you know why your counsel was saying
6  that production was complete?
7          MR. WIENER:  Objection.  Invades the
8  attorney-client privilege and the attorney work product
9  doctrine.  I'm going to instruct the witness not answer.
10  BY MR. PRESTON:
11     Q   Okay.  Let's go to Exhibit 12, upload that.
12  Exhibit 12 is a supplemental declaration that was filed
13  on August 23, 2023, and it is ECF 94.  Do you have it?
14         (Exhibit 12 was marked for
15          identification.)
16     A   I am just about opening it.  Yes.  Opened.
17     Q   Okay.  Paragraph 2 concerns archived
18  informations that were stored by CCCF and NBP.  Was
19  there any issue with searching for these archived
20  emails?
21     A   Which one are you reading -- am I reading?
22  What line?
23     Q   It's Line 13, Paragraph 2.
24     A   Okay.  So what was the question again?
25     Q   Okay.  So that response took 17 seconds.  The
                                                    Page 62

1  question is, did Defendants encounter any difficulty
2  recovering and producing documents that were archived?
3          MR. WIENER:  And I'm going to instruct
4  the witness not to answer any question after you say how
5  long his last answer took.  It's a waste of time.  It's
6  badgering and obnoxious.  Stop doing it.
7          MR. PRESTON:  He's delaying.  I'm sorry
8  that you don't like somebody noticing that.
9          MR. WIENER:  No, he's not delaying.  He's
10  thinking about the question, which is entirely
11  appropriate.  If you're going to do a freaking countdown
12  on how long every answer takes, we're going to end the
13  deposition.  That's not a proper tactic.  It's harassing
14  and obnoxious.
15  BY MR. PRESTON:
16     Q   All right.  Paragraph 3.  It says you are the
17  only person at CCCF and NBP who had any communications
18  with Digital Media Solutions; is that correct?
19     A   Yes.
20     Q   Later on in Paragraph 3, it says all of your
21  archived emails were searched.  Were any other emails
22  searched?
23     A   You mean my emails?  Yes.
24     Q   Was any other person's email, any other email
25  accounts searched?
                                                    Page 63

1      A   Yes.  We also searched Ishwinder Judge's
2  accounts.
3      Q   And so the search was limited to your account
4  and Ishwinder Judge's account?
5      A   That is correct.
6      Q   Okay.  It then says, "The archived emails were
7  first downloaded into an archived email folder and were
8  then searched for relevant information."  Why were these
9  emails downloaded into an archived email folder?
10     A   Why were they downloaded?
11     Q   Why were they, yes.
12     A   How would we search for them if we don't
13  down -- we had to get that information to search for it.
14     Q   Well, couldn't you search for them on the
15  server, on your email server?
16     A   I don't know the answer to that.  Probably, I
17  mean, there could be a way.  I do not know, but that's
18  the way I did it.
19     Q   Okay.  And you said "searched for relevant
20  information."  What do you mean by "relevant
21  information" there?
22     A   What do I mean by "relevant information"?
23     Q   Yes, sir.
24     A   I believe whatever the email -- so I did
25  the -- what -- for me, relevant information is searching
                                                    Page 64

1  by the name Kelly Pinn and DMS.
2      Q   Okay.  And you did not search for Shiv Johar?
3      A   I don't recall at that point.  At -- at that
4  time, I did.
5      Q   Okay.  Did you download all of your archived
6  emails?
7      A   Did I download all of the archived emails?  I
8  downloaded the entire archive, yes.
9      Q   Okay.  All right.  So I'm going to upload
10  another exhibit.  Actually, two other exhibits.
11     A   Which one?
12     Q   So 13 and 14 are -- it's an email and then a
13  spreadsheet of email headers that was attached to the
14  first email.  So Exhibit 13 is an email I sent to your
15  counsel.  Exhibit 14 is essentially a spreadsheet
16  created out of the email headers that were attached to
17  Exhibit 13.
18         (Exhibits 13 and 14 were marked for
19          identification.)
20     A   Which one do you want me to first open, 13 or
21  14?
22     Q   Why don't you look at 14?  I think that's
23  the best use of our time.
24     A   One second.  Hold on.  I'm not there.  Okay.
25  I have it open.
                                                    Page 65

17 (Pages 62 - 65)

1    Q   Okay.  When did you learn that these emails
2  were missing from Defendants' production?
3           MR. WIENER:  Objection.  Assumes facts
4  not in evidence.
5           MR. PRESTON:  I'll represent that these
6  emails were missing from Defendants' production.
7           MR. WIENER:  Same objection.  I don't
8  care for your representations.  Also, was this
9  spreadsheet produced at any time?
10          MR. PRESTON:  This is an exhibit.
11  Essentially, these are the -- it's an exhibit that was
12  prepared from documents that I gave to you.
13          MR. WIENER:  All right.  It's our
14  position that it operates as a waiver of the attorney
15  work product doctrine.
16          MR. PRESTON:  Whatever.  Sure, to the
17  extent that there's missing emails.
18  BY MR. PRESTON:
19    Q   All right.  So it's been 60 seconds since I've
20  asked my question, Mr. Engineer.
21          MR. WIENER:  No, that's incorrect.  You
22  continued to make statements, which he needs to listen
23  to.  It hasn't been 60 seconds.  You're just lying and
24  misrepresenting the record, and you waived the attorney
25  work product.

Page 66

---

1  is interesting.
2  BY MR. PRESTON:
3    Q   All right.  Let's look at Exhibit 15.  This is
4  an email from your counsel dated September 25, 2023.
5  I'm going to represent to you that that attachment
6  included, I think, some 52 emails.
7          (Exhibit 15 was marked for
8           identification.)
9    A   I don't see any attachments.  I just see an
10  email.
11    Q   Correct.  I just sent the email.  I did not
12  include any attachments to that email.
13    A   Okay.
14    Q   So this is a production that was made in
15  September of 2023.  Do you know if any of these emails
16  had been produced before?
17          MR. WIENER:  Objection.  You're not
18  showing the emails.  There's absolutely no way he could
19  possibly cross-reference non-existent emails with a
20  prior production.
21          MR. PRESTON:  Right.  So it's a Rule
22  30(b)(6).  He's supposed to know what the organization
23  knows.
24          MR. WIENER:  Well, it -- Ethan, give me a
25  break.  How is he supposed to reference it?  If you want

Page 68

---

1           MR. PRESTON:  Seth, you are living in a
2  fantasy world.  That's not waiver.  That's preparing an
3  exhibit.  Any waiver is limited to that exhibit.
4           MR. WIENER:  No, it's not.
5           MR. PRESTON:  I don't know what --
6           MR. WIENER:  You don't get to selectively
7  waive the attorney work product doctrine, and I'm
8  absolutely not living in a fantasy world that if you
9  continue to speak, he can't work on formulating an
10  answer.
11          MR. PRESTON:  I'm responding to your
12  objections.  You're obstructing this deposition.
13          MR. WIENER:  I'm not obstructing
14  anything.  I'm entitled to make objections, and I intend
15  to do so, and he's not going to be able to respond while
16  we're discussing the objections.  So it has not been 60
17  seconds since you asked the question, because there was
18  a number of intervening objections.
19          MR. PRESTON:  Your objections delay his
20  answer.  I don't know what you want.
21          MR. WIENER:  I want -- I'd like you to
22  make reasonable questions.  That's it.  I'm not going to
23  stop making objections to improper questions just so we
24  can speed things up for you.
25          MR. PRESTON:  Your definition of improper

Page 67

---

1  to show him each individual email --
2           MR. PRESTON:  It's what's produced when.
3  That's the point of this deposition.  There's a court
4  order saying that.
5           MR. WIENER:  You're not going to ask him
6  about emails without showing it to him.  I'm going to
7  instruct him not to answer.  If you're not willing to
8  show him the emails, it's not a fair question.
9  BY MR. PRESTON:
10    Q   There are emails that you produced.  Were
11  there new emails produced in September?
12          MR. WIENER:  I'm going to instruct him
13  not to answer.  You're not showing him what was produced
14  before and what was produced afterward.
15          MR. PRESTON:  I don't think that's my
16  obligation.
17          MR. WIENER:  That's absolutely your
18  obligation.  It's on record.
19          MR. PRESTON:  No, it's not.
20          MR. WIENER:  He's supposed to remember
21  what 52 separate emails were produced on what date?
22          MR. PRESTON:  Seth, this is going to go
23  in front of the judge.
24          MR. WIENER:  Right.  And I'll be glad to
25  explain to the judge that no human being could possibly

Page 69

---

18 (Pages 66 - 69)

1  cross-reference emails if you're not going to show it to
2  him.
3          MR. PRESTON:  Right.  But they're going
4  to -- he's supposed to know whether or not new emails
5  were produced in July or September.
6          MR. WIENER:  That's not one of the
7  discussion topics, and you need to show him the emails
8  for him to answer that.
9          MR. PRESTON:  I don't think I do.  I
10 don't have to show him every document that's referenced
11 in a deposition.
12         MR. WIENER:  It's impossible for any
13 human being to recall whether 52 emails that you're not
14 showing him were previously produced.  How can anyone do
15 that?  That's not the point of a 30(b)(6) deposition.
16         MR. PRESTON:  I've heard enough.  I'm
17 going to ask the question again.
18 BY MR. PRESTON:
19     Q   Were any new documents produced in September
20 2023?
21     A   I believe every single document have
22 been -- whatever was requested, we've produced it.
23     Q   When did you produce every single document?
24     A   Well, I have no idea to when we produced.
25 There were lot of emails that were produced, so we've

1  produced them.  I don't know when.  I mean, I cannot go
2  back and recall exactly which date, what was produced,
3  but we've produced everything.
4      Q   Okay.  I'm going to have you look at Exhibit
5  16.  Exhibit 16 is one of the documents that was
6  produced by Defendants in September of 2023.  Do you
7  have Exhibit 16 in front of you?
8          (Exhibit 16 was marked for
9          identification.)
10     A   Not yet.  I do.
11     Q   Okay.  Do you see a table in the center of the
12 document?
13     A   Yes.
14     Q   Where is that table from?
15     A   I have no idea.  I would -- if -- if I would
16 have to, I -- I would not like to guess, but it's
17 probably the DMS's portal.
18     Q   Okay.  Let's go to another.  All right.  I've
19 uploaded Exhibit 18.  Can you look at Exhibit 18?
20         (Exhibit 18 was marked for
21         identification.)
22     A   I'm not there yet.  I can't.  One second.
23 Yes, I have it.
24     Q   Thirty-three seconds.  All right.  It says,
25 "We will have report alongside the" --

1          MR. WIENER:  I'm going to instruct him
2  not to answer.  He was opening a document because you
3  refuse to show it to him on the screen.  Show him every
4  document, going forward, on the screen, if you're going
5  to fault him for actually taking the time to open the
6  documents using Google Drive.  That's freaking putrid,
7  Ethan.  Show him the documents on the screen going
8  forward.
9          MR. PRESTON:  If you want to pretend your
10 client's -- it's fine.  I can't stop you, but I'm going
11 to respond and I'm going to manage my deposition well.
12 All right.
13         MR. WIENER:  I'm going to instruct him
14 not to answer unless you're showing documents on the
15 screen.  That's not right, what you just did.  He's
16 taking the time to open a document using Google Drive,
17 which is a three-step process.
18         MR. PRESTON:  You're delaying this
19 deposition now.
20         MR. WIENER:  No, you're faulty, and
21 you're trying to create a sense that he's creating delay
22 opening documents that you're sending to him using
23 Google Drive.  That's not right.
24         MR. PRESTON:  Thirty-six seconds.
25         MR. WIENER:  Fine.  We're going to take a

1  five-minute break, Ethan, and you can start conducting
2  yourself like a professional.  I'm going off the record.
3          MR. PRESTON:  I think this is
4  professional.  I think that you've coached your client
5  very well.  I'm impressed.  That's all.
6          MR. WIENER:  Ethan, shut up.  You're
7  acting like an ass.  I'm going off the record.
8          THE OFFICER:  Okay.  We are now off the
9  record at 11 -- at 1:40 p.m.
10         (Off the record.)
11         THE OFFICER:  Okay.  We are now back on
12 the record at 1:44 p.m.
13 BY MR. PRESTON:
14     Q   All right.  So Exhibit 18 is an email that was
15 produced in September 2023 by the defendants.  The first
16 sentence says, "We will have the report alongside the
17 avatar and live calls on the Google spreadsheet
18 shortly."  What is "the avatar"?
19     A   I think avatar is what DMS categorize their
20 calls on the way they were doing their marketing.
21     Q   What category was the avatar?
22     A   I have no idea.  It is a DMS thing that they
23 did.
24     Q   But it's your email.  What did you mean when
25 you said "avatar"?

19 (Pages 70 - 73)

| | |
|---|---|
| 1   A   It's the calls that they were sending. | 1   Q   Who is that? |
| 2   Q   But they also sent live calls.  So what's the | 2   A   That is our accounting person. |
| 3  distinction between avatar and live calls? | 3   Q   Is she a CCCF employee? |
| 4   A   I think they were the same.  It was just two | 4   A   On a part-time, yes. |
| 5  different, I think, ways that they were doing it. | 5   Q   Okay.  Going to add another exhibit.  Exhibit |
| 6   Q   What was different about them? | 6  21.  Do you have exhibit 21 in front of you? |
| 7   A   I don't think there was anything.  I don't | 7       (Exhibit 21 was marked for |
| 8  recall anything being different. | 8       identification.) |
| 9   Q   So why did you use two different phrases to | 9   A   Not yet.  One second.  I do. |
| 10  describe these calls? | 10   Q   Okay.  So this is an email that was also |
| 11   A   Well, I don't recall.  I think it is what they | 11  produced in September 2023.  There's an attachment, |
| 12  categorized them different.  They categorized it, and | 12  which is an Excel spreadsheet.  What is a "live |
| 13  that's what we were following, because it's their thing, | 13  transfer"?  It says, "38 live transfers." |
| 14  not ours.  They're sending the calls. | 14   A   They're just -- I think they -- DMS |
| 15   Q   So you had no way to distinguish between what | 15  distinguished these, so that these are the -- but you |
| 16  was an avatar call and what was a live call? | 16  asked me the last time too.  I think they're the ones |
| 17   A   Say that -- repeat that question again.  I | 17  that did these categories.  All, live transfer, the down |
| 18  couldn't -- I -- I didn't get that question. | 18  sells, and then the double verified.  It was all DMS. |
| 19   Q   You had no way to distinguish between what was | 19   Q   Do you know how -- well, how did you |
| 20  an avatar call and what was a live call? | 20  categorize something as a live transfer? |
| 21   A   I believe that they were coming in on the same | 21   A   I did -- I did not.  They did. |
| 22  lines, but for some reason, they had us distinguish | 22   Q   Okay.  What is a "down sell"? |
| 23  those two. | 23   A   I have no idea.  It's a DMS categorization. |
| 24   Q   Is a live call somebody where there's a live | 24   Q   Okay.  What's a "double verified"? |
| 25  telemarketer on the line? | 25   A   I would have no idea. |
| Page 74 | Page 76 |

| | |
|---|---|
| 1   A   I don't know when he keeps saying | 1   Q   Okay.  So looking at this spreadsheet, where |
| 2  "telemarketer."  Who is a telemarketer? | 2  did this data come from? |
| 3   Q   Okay.  It references a Google spreadsheet. | 3   A   I don't see the spreadsheet. |
| 4  Where is that Google spreadsheet?  Has that Google | 4   Q   Keep strolling down. |
| 5  spreadsheet been produced? | 5   A   Oh, okay.  Yeah, I do see it.  What was the |
| 6   A   It's DMS.  DMS has that.  They are the ones. | 6  question now? |
| 7   Q   So you were able to add data to the Google | 7   Q   Where did this data come from? |
| 8  spreadsheet? | 8   A   This would also have to be from the DMS portal |
| 9   A   Yes. | 9  that sent those calls to us. |
| 10   Q   Do you have access to the Google spreadsheet? | 10   Q   Okay.  So how did you get this data? |
| 11   A   I don't think so.  They -- they have taken | 11   A   From DMS. |
| 12  everything away. | 12   Q   Okay.  There's a column that says C-L-I-D.  Do |
| 13   Q   Did you have access to the Google spreadsheet | 13  you recognize that column? |
| 14  in July 2022? | 14   A   It's probably something that they -- DMS did. |
| 15   A   I don't think so.  I don't -- I don't remember | 15   Q   Okay, let's get document -- so I've uploaded |
| 16  back -- going back to July '22. | 16  Document 22.  If you'll look below, it's a email chain |
| 17   Q   Okay.  All right.  So let's look at Exhibit | 17  and one of your emails is sent on August 3, 2021 at |
| 18  20.  Do you have that in front of you? | 18  11:23 a.m. |
| 19       (Exhibit 20 was marked for | 19       (Exhibit 22 was marked for |
| 20       identification.) | 20       identification.) |
| 21   A   No, not yet.  Yes, I have it open. | 21   A   Can I -- I don't know where it -- there's so |
| 22   Q   All right.  There's an email address here. | 22  many in this.  One second.  Which? |
| 23  "trinhn@cccfusa.org."  Do you recognize that email | 23   Q   You know what?  I can probably -- |
| 24  address? | 24   A   Can you tell me? |
| 25   A   I do. | 25   Q   So it's document -- it's the new exhibit. |
| Page 75 | Page 77 |

20 (Pages 74 - 77)

1   It's Document 22.
2       A   No, I'm on Document 22.
3       Q   Okay.  So what I'm going to do, I'm going to
4   share the screen.  Can you see the screen now?  No, you
5   can't.  Here, let's try this.  Can you see the screen
6   now?
7       A   No, I don't see.  I only see mine.
8           MR. WIENER:  I can see it now.
9           THE WITNESS:  I do.  I do see it now.
10  BY MR. PRESTON:
11      Q   Okay.  So I've highlighted a sentence.  It's
12  an email chain from you.  It says, "Please send me
13  portal information, et cetera, once the campaign is set
14  from your end."  What portal information are you
15  referring to?
16      A   That's the same thing we've been talking about
17  this whole time, that -- the DMS Excel portal that
18  they -- that they host, that they have.
19      Q   Okay.  Okay.  And it says -- what's the
20  "portal information"?  Is that a login and a password?
21      A   Either it's a login.  I -- I think it -- it
22  was so long back.  I don't remember if it was a login or
23  a password.  I -- I don't -- it was an Excel-type kind
24  of a portal.  So you -- I think it was done through
25  either Google or somehow that they gave us access to it.

Page 78

1       Q   Okay.  When you say "et cetera," what does
2   that mean?
3       A   What does "et cetera" mean?
4       Q   Yeah, in that sentence.
5       A   I have no idea.  I mean, what -- what --
6       Q   All right.  That's fine.  It might not mean
7   anything, and that would be an acceptable answer.
8       A   Do you still want me to answer it?
9       Q   Sure, if you like.
10      A   No, no.  I -- I don't know what you -- what
11  you wanted, so I'm just asking you.
12          MR. PRESTON:  Okay.  Can we take a break
13  for about five minutes?
14          MR. WIENER:  Sure.
15          THE WITNESS:  Oh, absolutely.  I would
16  love that.
17          MR. PRESTON:  Okay.
18          THE WITNESS:  Five minutes or ten
19  minutes?  It's one -- five minutes?
20          THE OFFICER:  We're now off the record at
21  1:56.
22          (Off the record.)
23          THE OFFICER:  We're now back on the
24  record at 2:04 p.m.
25  //

Page 79

2       Q   All right.  We're in the home stretch.
3   Mr. Engineer, I ask to look at Exhibit 20 again.
4       A   I have it open.
5       Q   Okay, excellent.  If you have that open and
6   you can zoom in, there are two screenshots.  Or maybe
7   they're not two.  It's one screenshot, but there's two
8   images.  Do you recognize those images?
9       A   I can barely see these.  I can -- too much.  I
10  could see them, but they're not very clear, but I could
11  see them.
12      Q   Okay.  Well, my question is, do you -- that
13  obviously looks like, to me, a screenshot of a portal or
14  something, and I'm wondering if you recognize that
15  portal.  Looks like a webpage, partial screenshot of a
16  webpage.
17      A   I would have no idea what that -- if it's a
18  portal or what, but it's from DMS for sure.
19      Q   Okay.  Let's see where we're at.  We're on 25.
20  All right.  All right.  I'm going to upload Exhibit 25.
21  It's "Defendants' Document Production CCCF 0002."  Let
22  me know when you have it open.
23          (Exhibit 25 was marked for
24          identification.)
25      A   I do.

Page 80

1       Q   Okay.  Do you recognize this document?
2       A   Yes.
3       Q   Okay.  What is that?
4       A   It is the call record of the plaintiff.
5       Q   Is this a screenshot of CreditSoft?
6       A   Yes.  This is a system from where this
7   information goes into CreditSoft, yes.
8       Q   Okay.  Do you see the boxes at the very end?
9   There's these boxes of text with the word "view" next to
10  them, and there's a "date created" on the other side.
11      A   Yes.
12      Q   Okay.  If you look at the very bottom of the
13  last box at the bottom, do you see the text, "As I went
14  back to the question"?
15      A   Sorry?
16      Q   So the bottom box, the third box at the very
17  bottom.  Do you see the very last sentence?  It says,
18  "As I went back to the question"?
19      A   Yes, I do.  I see it.
20      Q   Okay.  That sentence has been cut off, isn't
21  that right?
22      A   I -- I wouldn't know if it's cut off or that's
23  the final without a period.  I would have -- I -- I
24  wouldn't know.  It just --
25      Q   So you can't tell if that -- well, "As I went

Page 81

1  back to the question," is that a complete sentence?
2      A   Again, I wouldn't know if it is or not.  It's
3  missing a period.  So maybe it's -- they forgot to put a
4  period, but -- or I don't know.
5      Q   Okay.  All right.  So we're going to upload a
6  few more documents.  Some of these documents are
7  important for the record, but I don't necessarily need
8  to ask you about them.  Today, I received a zip file
9  from your counsel.
10     A   You're getting cut off.  I can't hear you.
11     Q   Sorry.  I didn't complete the sentence.  I
12 received a set of documents from your counsel today in
13 an email titled, "Skype Files Native Format."  Did you
14 produce your Skype account today?
15     A   Yes.
16     Q   Okay.  How did you do that?
17     A   Oh boy.  That was one aruduous task, and I'm
18 sure you know about it, because it -- it is just
19 something -- I don't know how the Skype does it, because
20 you had to go into Command Prompt.  And I'm sure
21 you -- if you've done it, you -- you know it.
22         The -- the instructions are not as easy
23 to -- we gave -- I had to, like, literally look it up on
24 how to do this, because it required going into, like,
25 Command Prompt and typing in commands to extract this

Page 82

1  T-A-R file.  And, oh boy, it -- it just was something
2  that we couldn't do it.
3          And then I finally spent so much time to just
4  figure out how to do this T-A-R file, and I was able to
5  finally do it.  It took a little bit of time, but I did
6  it.
7          MR. WIENER:  Ethan, I also want to note
8  for the record that it contains personal files as well.
9  We don't have a way of segregating them.
10         THE WITNESS:  Oh, that's another thing
11 that we tried so hard, but Skype has no way to
12 differentiate your personal -- I mean, your other stuff
13 with whatever was requested.  But we tried, tried, tried
14 to kind of pull that information out, but there is no
15 way.
16         The T-A-R file is just one lumps file
17 that has everything in it, including my personal
18 information in it.  It has everything that I have, but I
19 just -- I was finally able to do it, because it was just
20 very, very complicated.  It is not for any normal person
21 to just go into Command Prompt and do all the stuff.
22 BY MR. PRESTON:
23     Q   Okay.  What was the Command Prompt that you
24 used?
25     A   I don't really recall.  It's all -- it was all

Page 83

1  part of the document that said what you have to do.  It
2  is in Skype's instructions on going into Command Prompt,
3  and then you had to type in these commands to kind of do
4  all that.  It was super complicated, but I managed to
5  finally do it.
6          I followed these instructions, but if you
7  don't type these commands correctly, there is no way you
8  could -- you could get that.  And that was what was
9  arduous in terms of getting that file, and, just, Skype
10 makes it very, very hard to do that.  Not being able to
11 differentiate it, it was extremely hard to export it.
12         But then after you export it, then you have to
13 extract it, before which you have to go into this
14 Command Prompt and literally type these commands.  And
15 if you don't type them correctly, you're not going to
16 get them.  But anyways.
17     Q   Okay.  Hold on.  I need to -- sorry, your
18 question is -- excuse me, a little bit of delay.  So I'm
19 going to upload.  We're going to designate it as Exhibit
20 29A.  This is a screenshot of a Microsoft website.  Let
21 me know when you have Exhibit 29A.
22         (Exhibit 29A was marked for
23          identification.)
24     A   I do.
25     Q   Okay.  Can you open that up?

Page 84

1      A   I do.  I have it open.
2      Q   Okay.  Do you see what it says?
3      A   "How do I export or delete?"
4      Q   Yes.
5      A   Yes, I see it.
6      Q   Do you see the "Step 1: Sign into the export
7  page with your Microsoft account"?
8      A   Yes.
9      Q   Did you do that?
10     A   Yes.
11     Q   Okay.  And then after that, you downloaded it
12 on the export page?  You downloaded a copy of your
13 export?
14     A   That is correct.  And then you have to go
15 into --
16     Q   Okay.  Sorry.  What did you say?
17     A   And then you have to go into this whole
18 Command Prompt thing that I was talking about.
19     Q   To -- well, okay.  So why?  What did you need
20 to do after downloading the export?
21     A   Why don't you just click on that export page?
22 It guides you through it.
23     Q   Well, we don't have time for me to go through
24 it right now, because we're going to --
25     A   That's exactly the instructions.  Once you

Page 85

22 (Pages 82 - 85)

1 click on the export page, it'll take you there. You log
2 in, and then you have to use Command Prompt to extract
3 the T-A-R file. And then after that, you got to go back
4 in and download this viewer. And then even in the
5 viewer, you have to then open it up with this special
6 file that will read the extracted Command Prompt file.
7    Q   Okay. But you didn't need to use the viewer
8 to just simply export things.
9    A   I'm sorry?
10    Q   Did you need to use the viewer to export
11 things?
12    A   No, you click on this export. Once you click
13 on this -- I could walk you through the whole process,
14 because I spent so much time on this. I'm, like -- but
15 if you click on that export page, it'll take you to a --
16 where you download it, and then you have to go into
17 Command Prompt, and then you go into Command Prompt to
18 extract that file.
19        And then you go back in, and then you download
20 this viewer, because you cannot read the T-A-R file.
21 It's a special file. And then you need another viewer
22 that you got to download to view it.
23    Q   Okay. So at the end of the situation, there's
24 a dot T-A-R file?
25    A   That is correct.

Page 86

1 issue was that the format in which we submitted was
2 requiring this native file of T-A-R. We submitted
3 everything when -- when it was requested, but to get to
4 this T-A-R file, that's what we are just talking about.
5    Q   So I didn't receive anything from your Skype
6 folder or your Skype account until today. This was
7 requested in 2023. Can you explain why we didn't
8 receive anything from your Skype account until today?
9    A   Everything was submitted. I have -- I'll have
10 to -- we literally were able to submit it, but I think
11 the problem was that the format in which it was
12 requested was the problem. But we submitted everything
13 from our end. Maybe Seth needs -- Seth might have to
14 take a look and see if there was some discrepancy in him
15 send -- forwarding it to you.
16    Q   Okay. So you, you think that Seth might not
17 have -- he would've had it, but wasn't able to give it
18 to me until today?
19    A   I do not know that. I'm just saying that
20 everything from our end was submitted, everything.
21    Q   Okay. I know that some files were received
22 today. I guess my question is, when were the files
23 submitted?
24        MR. WIENER: And our discovery letters
25 had referenced that we produced the Skype files. It was

Page 88

1    Q   After the -- okay. Did you produce a dot
2 T-A-R file?
3    A   I'm sorry. I just -- we -- we just sent it.
4    Q   No. I didn't get a dot T-A-R file. I got a
5 collection of images and JSON files, dot J-S-O-N files.
6    A   Well, that's why you need a viewer, that you
7 cannot just -- okay. That's the problem, that you need
8 the viewer to view the T-A-R file. You cannot just view
9 the T-A-R file, because they're JSON files, so you have
10 to download the viewer.
11    Q   I understand. But that's my problem. I guess
12 my question is, can you just produce the T-A-R file?
13    A   Sure. Absolutely.
14    Q   Okay. Let's do that. Okay. So we had asked
15 for the Skype export previously, and I guess my question
16 is, when was the first time you attempted to export your
17 Skype account?
18    A   When the first request was sent. I -- I don't
19 recall when, but whenever the request came in, and we
20 submitted everything that we could submit.
21    Q   Okay. This was first requested probably in
22 July or August or September of 2023. And is your
23 testimony that you were unable to complete this process
24 until today?
25    A   No. We submitted everything, but I guess the

Page 87

1 a Word document, I believe, and it was, like, cut and
2 paste, but I do believe you got those. I don't know if
3 they were Bates stamped.
4        MR. PRESTON: I actually -- yeah, I don't
5 know that I ever got those, but in any event, I have
6 some documents now, and you guys are going to give me
7 the T-A-R file later on. So, you know, I don't know
8 that we need to belabor the point.
9        MR. WIENER: My only concern, again, is
10 that there's emails that are Skype communications that
11 clearly have no relevance, but we have no way of
12 segregating them. Essentially, you got far more today
13 than I would have ever produced, mainly just to do with
14 technological issues.
15 BY MR. PRESTON:
16    Q   All right, so let's go to Exhibit 28. This is
17 a discovery letter that was submitted.
18        (Exhibit 28 was marked for
19         identification.)
20    A   Which one? Which number?
21    Q   Exhibit 28. And it's page 4. It is the
22 fourth email from the bottom.
23    A   On -- on page four, there is no emails.
24    Q   Sorry. It's the fourth paragraph
25 that's -- excuse me.

Page 89

23 (Pages 86 - 89)

Page 90

1    A   On page four?
2    Q   Yes, sir.
3    A   Okay.  I'm there.  Which -- which paragraph is
4    it?  Can you -- if you tell me what it starts with --
5    Q   It's the fourth from the bottom.  It says, "In
6    response to Plaintiff's request."
7    A   Yes.  Okay, got it.
8    Q   It says, "In response to Plaintiff's request,
9    Defendants have searched the Skype accounts of
10   custodians relevant to this case."  Who are the
11   custodians relevant to this case?
12   A   I wouldn't know who.  I mean, it's probably
13   DMS and who was involved, because that's the only people
14   we communicated with.
15   Q   Well, I think what -- the way I understood
16   that sentence is that you searched the Skype accounts of
17   the CCCF employees which were relevant to this case.
18   And so my question is, which CCF employees were their
19   Skype accounts were searched?
20   A   There is no -- the CCC -- no CCCF employees
21   have Skype accounts.  The Skype account was just me
22   communicating with DMS, and you see that in the
23   production that we have sent.  We -- we've sent that,
24   all of those -- all of those Skype accounts.
25   Q   I'm sorry, did you say you had searched all

Page 91

1    the Skype accounts?
2    A   No, I said we've submitted all our Skype chats
3    or whatever that was requested with DMS.  Everything has
4    been submitted.
5    Q   Okay.  Exhibit 29, is a email from your
6    counsel and it attaches four exhibits, four emails.
7            (Exhibit 29 was marked for
8            identification.)
9    A   Twenty-nine or Twenty-nine A?
10   Q   Twenty-nine.
11   A   Twenty-nine.  Okay.  I have it open.
12   Q   And it had four emails attached to that email.
13   Do you know if any of these documents had been produced
14   prior to July 8, 2024?
15   A   I wouldn't know specifically if these were
16   produced, but everything was produced.  And again, this
17   might be with something where we produced it, and there
18   was -- everything, Seth had it, and then we forwarded it
19   to Seth.
20   Q   Okay.  So I'm going to add another exhibit.
21   It's Exhibit 30.  And this is also a email from your
22   counsel yesterday.  The subject is called, "Excel copy
23   of DMS call records."
24           (Exhibit 30 was marked for
25           identification.)

Page 92

1    A   I see it.
2    Q   Okay.  What is this Excel file?
3    A   So I believe we had submitted an -- a PDF, but
4    the request was that we needed it again in the native
5    format with all the data that was requested.  So we
6    again went back in.  I had to learn how to do this,
7    export into this Excel format with all of the data that
8    we had from DMS that came into our system.
9    Q   Okay.  If you can scroll down, are these
10   records of calls that were made?
11   A   I'm sorry?  Records of calls?
12   Q   Right.  It says "call records."
13   A   Where?  Which -- which line are you seeing
14   call records?
15   Q   So if you look at the first page, it says,
16   "Subject: Excel copy of DMS call records."
17   A   I didn't type that.
18   Q   Then you turn -- I'm sorry?
19   A   I did not type that email.
20   Q   I understand.  So my question is, are these
21   call records?
22   A   Call records?  I wouldn't particularly call
23   them "call records."  They are all our records of all
24   the clients that CCCF has from DMS.
25   Q   Okay.  So they're just a list of clients.

Page 93

1    It's not necessarily a list of call records.
2    A   I don't know what the difference would be
3    between clients.  I -- I don't know.  I cannot --I don't
4    know what the --
5    Q   Well, a client would be, you know, a name and
6    an address, where a call record would be the date and
7    time of the call and the numbers that were involved, the
8    outgoing number that made the call and the incoming
9    number, the recipient call number.
10   A   We never made any calls, so we only take the
11   calls, so we wouldn't have that information.
12   Q   Sure.  But Shiv Johar made calls?
13   A   I don't -- I -- I don't know that.
14   Q   How did he transfer calls to you if he did not
15   make the calls?
16   A   I -- calls are only transferred by DMS.
17   Q   Well, if you asked DMS, they would tell you
18   that it's just people using their system, and it's Shiv
19   Johar transferring the call.
20   A   I don't -- I don't know that that's DMS's
21   take, but I wouldn't know that.
22   Q   All right.  So if you look at page 2, at the
23   very top line, there's a number of columns, and there's
24   identifiers to the column.  The first column is "lead
25   number."  What is a "lead number"?

1      A   That's the number that gets assigned in our
2   system.
3      Q   Which system?
4      A   CreditSoft.
5      Q   Okay.  What is a "lead"?
6      A   A "lead"?
7      Q   Yes.
8      A   I would say a lead is any potential person
9   that calls in to request our help for help.  We have to
10  intake them, and that's it.  Automatically, when you
11  create an entry into the system, it creates a ID number,
12  a primary kind of identifier or something.
13     Q   Okay.  Sure.  The third column says, "Date
14  export to OES."  What is that?
15     A   It's just the intake system, and then it comes
16  into CreditSoft.  So that's where it actually goes in,
17  into CreditSoft system.
18     Q   I'm not sure I understand.  What is --
19     A   So I expect, during the first -- like, there's
20  a lot of -- the whole budget analysis that we have to
21  do, and the whole counselor that -- what -- whatever
22  they do, they have to -- they take it, and they have to
23  input all of that information.
24        So that's where we have to export this client
25  in, and then we do this whole budget analysis counseling

Page 94

1   to kind of go through their financial picture, to kind
2   of see what their income, their expense, all of that.
3      Q   Okay.  So it's exported to CreditSoft, is that
4   right?
5      A   Correct.  It's -- it's built in.  It's all
6   built in.
7      Q   What is it exported from?
8      A   It's just an -- it's just a -- it's not
9   exported from -- it's just like an API that you -- kind
10  of, it goes into that system.  It goes into and merges
11  it into CreditSoft, goes into CreditSoft.
12     Q   Okay.  So API, what is that?
13     A   It's just the data moves from one column into
14  another column to be able to do more detailed stuff in
15  CreditSoft.
16     Q   Okay.  So it's all within CreditSoft?
17     A   Correct.
18     Q   Okay.  What is "OES"?
19     A   It's just a way of telling the API to move
20  this client in.  It's -- we just call it that.  There's
21  no name for it.
22     Q   I'm going to upload another couple of
23  documents.  So this is Document -- it's CCCF 29, 239,
24  and 264.
25     A   I'm sorry.

Page 95

1      Q   So these are documents you've produced.
2   They're organization charts.
3      A   I haven't seen that yet.  One second.
4      Q   Yeah.  It's Exhibit 31.
5          (Exhibit 31 was marked for
6          identification.)
7      A   Okay.  I have it.
8      Q   So looking at page 1, is this a complete list
9   of all CCCF'S employees?
10     A   When it was produced, yes.
11     Q   Okay.  Are there other employees?
12     A   Recently, they've added a few more, very
13  recently.
14     Q   Okay.  Like, estimate how long.
15     A   How long did we add employees?
16     Q   Yeah, since they've been added.
17     A   I would say a couple months.
18     Q   Okay.  So I'm going to send up another
19  document.  So we're looking at Exhibit 32.  Do you
20  recognize -- the first five entries in this exhibit are
21  email addresses.  Do you recognize any of these email
22  addresses?
23          (Exhibit 32 was marked for
24          identification.)
25     A   I do not recognize the first one.  I do

Page 96

1   recognize the second one.
2      Q   Who is that?
3      A   Michael helps us with our state licensing.
4      Q   Your -- sorry.  Your state licensing?
5      A   Yeah.  So we are -- we have to be licensed and
6   in -- in every state that we do business in, and
7   requires a lot of documentation from our end.  And so
8   it's basically doing state -- every single state filing.
9   We have to be bonded, licensed and bonded in the states
10  that we do business in.
11     Q   Okay.  So he does regulatory stuff?
12     A   Correct.
13     Q   Okay.  Is he a full-time employee?
14     A   No.
15     Q   Okay.  Is he an attorney?
16     A   No.
17     Q   Okay.  Who is Tom H.?
18     A   Tom H. is -- he -- he helps us with our -- you
19  know, whenever we have CreditSoft issues, he would come
20  in on a part-time and help us with consulting on IT
21  stuff, and I can't do it.
22     Q   Okay.  So it's stuff that you can't do.  Okay.
23  The next entry, do you recognize that email address?
24     A   I do not.
25     Q   How about the next one, Nick A.?

Page 97

25 (Pages 94 - 97)

| | |
|---|---|
| 1   A   Yes, I do. | 1   what I do. |
| 2   Q   Who is that? | 2       Q   Sure, sure.  Am I pronouncing it right, |
| 3   A   We've added him recently. | 3   Faravahar? |
| 4   Q   Okay.  About how recently? | 4       A   Yes. |
| 5   A   I wouldn't know. | 5       Q   Okay.  Thank you.  Are you doing any work for |
| 6   Q   Two months? | 6   Faravahar?  Does, does Faravahar have any other clients |
| 7   A   I wouldn't know.  I wouldn't know. | 7   right now? |
| 8   I -- I don't want to guess. | 8       A   No. |
| 9   Q   Okay.  Ashley A.? | 9       Q   Is CCCF a client of Faravahar? |
| 10   A   No, no, not at all. | 10       A   No, I don't -- I don't -- I -- I -- no, I |
| 11   Q   So I'm going to go through the list of names | 11   don't think so. |
| 12   next.  I may mispronounce some of these, and I don't | 12       Q   Well -- |
| 13   mean to offend anybody, but I'm going to do my best.  Do | 13       A   Actually, I take that back, because |
| 14   you know who Pravesh Chopra is? | 14   CCCF -- there are -- there is stuff that, yes, |
| 15   A   I do -- I do know.  I do know him, but he's | 15   that -- that I would have to retrieve that back and make |
| 16   not part of CCCF. | 16   that correction, that CCCF could have -- I could have |
| 17   Q   How do you know him? | 17   done work for CCCF other than my stuff.  Yes. |
| 18   A   He is partners with Ishwinder Judge in | 18       Q   Is that contract operative today? |
| 19   franchise restaurants. | 19       A   I believe so. |
| 20   Q   Okay.  Kulwant Sran? | 20       Q   Does Faravahar receive income under that |
| 21   A   Kulwant, Aloke, and Sandeep, I know all three | 21   contract? |
| 22   of them because they're on the board. | 22       A   I don't know.  I'll have to look at that.  I |
| 23   Q   Whose board? | 23   don't -- I haven't done that, so -- but it's just -- |
| 24   A   CCCF's board of directors. | 24   I'll have to look at it. |
| 25   Q   Okay.  Geetika Walia? | 25       Q   Okay.  What is RJC? |
| *Page 98* | *Page 100* |

| | |
|---|---|
| 1   A   Yes, I know her as well. | 1   A   That's the franchise restaurants. |
| 2   Q   Who is she? | 2   Q   Okay.  All right.  It's the last one.  So |
| 3   A   She used to be the past president when I was | 3   these are documents that were produced to us in response |
| 4   employed at National Budget Planners. | 4   to, I think it's RPD 8. |
| 5   Q   Okay.  Layne Jensen? | 5   A   Sorry.  What am I -- what -- which document |
| 6   A   She used to be on the board of CC -- of | 6   did you want me to look? |
| 7   National Budget Planners. | 7   Q   So I've just uploaded it.  It's Exhibit 33. |
| 8   Q   Okay.  Alka Puri? | 8   It's documents that were produced to us in response to |
| 9   A   She was also on the board of National Budget | 9   RPD 8.  It's essentially payroll records for Larissa |
| 10   Planners when I worked for National Budget Planners. | 10   Brodsky. |
| 11   Q   Sanjeev Kanwar? | 11       (Exhibit 33 was marked for |
| 12   A   He is the president for National Budget | 12       identification.) |
| 13   Planners. | 13   A   I have it open. |
| 14   Q   Okay.  Faravahar, Incorporated? | 14   Q   Okay.  So I'm going to tell you that this sort |
| 15   A   That -- that is -- I -- I recognize that too. | 15   of only covers a period in 2022.  It only goes through |
| 16   Q   What is that? | 16   July 2022.  When was Ms. Brodsky hired? |
| 17   A   It's -- it's me, my company. | 17   A   I wouldn't know off the top of my head. |
| 18   Q   What does that company do? | 18       MR. WIENER:  I'm going to object to the |
| 19   A   Consulting. | 19   testimony, unless you want to agree that this remains |
| 20   Q   What kind of consulting? | 20   confidential. |
| 21   A   I've been in the -- been doing credit | 21       MR. PRESTON:  Oh, yeah.  No.  This can be |
| 22   counseling for 24 years.  So I consult with -- with | 22   confidential. |
| 23   people who -- who need or want -- have questions about | 23       MR. WIENER:  All right. |
| 24   anything to do with debt, credit counseling.  Knowing | 24   (Nonconfidential portion of transcript |
| 25   the vast experience that I've had for 24 years, that's | 25   ends.) |
| *Page 99* | *Page 101* |

26 (Pages 98 - 101)



Page 106

Page 108

Page 107

1     (Nonconfidential portion of transcript
2     begins.)
3        MR. PRESTON:  Okay.  I don't have any
4  more questions.  Do you plan to redirect, Seth?  Sorry,
5  Mr. Wiener?
6        MR. WIENER:  I'd like to do a very brief
7  redirect.
8        MR. PRESTON:  Okay.
9        MR. WIENER:  All right.
10          EXAMINATION
11  BY MR. WIENER:
12   Q   Mr. Engineer, have you made a good faith
13  effort to locate all responsive documents when
14  requested?
15   A   Yes.
16   Q   Have you intentionally withheld any documents
17  from your production?
18   A   No, never.
19   Q   And have you supplemented your production as
20  possible when you located additional responsive
21  documents?
22   A   Absolutely.
23   Q   Alright.  And has the production of documents
24  imposed a substantial financial burden on CCCF?
25   A   I mean, it has been a arduous task.  I mean,

Page 109

28 (Pages 106 - 109)

1  we are a very small nonprofit organization, and -- and
2  we do some great work in our community.  We help so many
3  clients across the nation with what our services is,
4  what we do.
5        You know, it just has been very, very hard for
6  us, with the limited resources we have, to -- to do all
7  the stuff that, you know, has been requested.  We've
8  done our best to do whatever we can from our end to
9  produce them.
10   Q   All right.  And there was a issue raised about
11  audio recordings not being retained.  Why were audio
12  recordings not retained?
13   A   Well, that's again to do with our, you know,
14  being a nonprofit credit counseling organization.  You
15  know, we have limited capacities on how much we can do.
16  So we -- the purposes for -- of the recordings are
17  literally just to help our counselors get better.  And
18  so those recordings get overwritten after 60 days.
19        We would have to buy enormous amount and
20  spend, like, enormous amount of money in terms of
21  storage to keep every single 180-minute counseling
22  session on record.  I mean, that would just take a whole
23  data center or something, and we don't have the
24  resources to do any of that.  I mean, that's the sole
25  reason why we have these policies, to help us.

Page 110

1   Q   All right.  And we produced an Excel
2  spreadsheet yesterday of DMS leads.  Do you recall that?
3   A   Yes.
4   Q   What was the source of those leads?
5   A   They were all from our CreditSoft CRM
6  database.
7   Q   All right.  And does that include all the
8  fields of information on the CreditSoft management
9  software database?
10   A   Yes.
11   Q   All right.  And does that list represent all
12  the leads that were sent to you by DMS?
13   A   Yes.
14   Q   Does it include live transfers?
15   A   It includes everything we got from DMS.
16        MR. WIENER:  All right.  Thank you.
17  Nothing further.
18        THE WITNESS:  Okay.
19        THE OFFICER:  Okay.  I don't have any
20  spellings or anything.  I don't believe so.  I just want
21  to see if, Mr. Wiener, did you want to order the
22  transcript?
23        MR. PRESTON:  Yes, I would.
24        THE OFFICER:  Okay.  And then the read
25  and sign will go to you as well?

Page 111

1        MR. WIENER:  Yeah, I don't think I need
2  the exhibits.  That was already produced. but --
3        THE OFFICER:  Okay.  That'll work.  I
4  won't attach it.  Okay.  Thank you.  So that's it for me
5  as well, and we are off the record at 3:13 p.m.
6        (Signature reserved.)
7        (Whereupon, at 3:13 p.m., the proceeding
8        was concluded.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 112

1        CERTIFICATE OF DEPOSITION OFFICER
2        I, FERNANDO PADILLA, the officer before whom
3  the foregoing proceedings were taken, do hereby certify
4  that any witness(es) in the foregoing proceedings, prior
5  to testifying, were duly sworn; that the proceedings
6  were recorded by me and thereafter reduced to
7  typewriting by a qualified transcriptionist; that said
8  digital audio recording of said proceedings are a true
9  and accurate record to the best of my knowledge, skills,
10  and ability; that I am neither counsel for, related to,
11  nor employed by any of the parties to the action in
12  which this was taken; and, further, that I am not a
13  relative or employee of any counsel or attorney employed
14  by the parties hereto, nor financially or otherwise
15  interested in the outcome of this action.
16
17        FERNANDO PADILLA
18        Notary Public in and for the
19        State of California
20
21  [X] Review of the transcript was requested.
22
23
24
25

Page 113

```
 1        CERTIFICATE OF TRANSCRIBER
 2        I, AMANDA DERBY, do hereby certify that this
 3  transcript was prepared from the digital audio recording
 4  of the foregoing proceeding, that said transcript is a
 5  true and accurate record of the proceedings to the best
 6  of my knowledge, skills, and ability; that I am neither
 7  counsel for, related to, nor employed by any of the
 8  parties to the action in which this was taken; and,
 9  further, that I am not a relative or employee of any
10  counsel or attorney employed by the parties hereto, nor
11  financially or otherwise interested in the outcome of
12  this action.
13
14
15                AMANDA DERBY
16
17
18
19
20
21
22
23
24
25
                                              Page 114
```

```
 1  Pinn, Kelly, Et Al. v. Consumer Credit Consulting, Et Al.
 2  Porus Engineer 6788338
 3        ACKNOWLEDGEMENT OF DEPONENT
 4     I, Porus Engineer, do hereby declare that I
 5  have read the foregoing transcript, I have made any
 6  corrections, additions, or changes I deemed necessary as
 7  noted above to be appended hereto, and that the same is
 8  a true, correct and complete transcript of the testimony
 9  given by me.
10
11  _____   _____
12  Porus Engineer              Date
13  *If notary is required
14        SUBSCRIBED AND SWORN TO BEFORE ME THIS
15  _____ DAY OF _____, 20___.
16
17
18  _____
19  NOTARY PUBLIC
20
21
22
23
24
25
                                              Page 116
```

```
 1  Pinn, Kelly, Et Al. v. Consumer Credit Consulting, Et Al.
 2  Porus Engineer Job No. 6788338
 3     E R R A T A  S H E E T
 4  PAGE_____ LINE_____ CHANGE_____
 5  _____
 6  REASON_____
 7  PAGE_____ LINE _____ CHANGE_____
 8  _____
 9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____   _____
24  Porus Engineer              Date
25
                                              Page 115
```

```
 1  seth@sethwienerlaw.com
 2        July 28, 2024
 3  Pinn, Kelly, Et Al. v. Consumer Credit Consulting, Et Al.
 4  DEPOSITION OF: Porus Engineer 6788338
 5     The above-referenced witness transcript is
 6  available for read and sign.
 7     Within the applicable timeframe, the witness
 8  should read the testimony to verify its accuracy. If
 9  there are any changes, the witness should note those
10  on the attached Errata Sheet.
11     The witness should sign and notarize the
12  attached Errata pages and return to Veritext at
13  errata-tx@veritext.com.
14     According to applicable rules or agreements, if
15  the witness fails to do so within the time allotted,
16  a certified copy of the transcript may be used as if
17  signed.
18           Yours,
19           Veritext Legal Solutions
20
21
22
23
24
25
                                              Page 117
```

30 (Pages 114 - 117)